## PHILLIP SEIBEL et al., Appellants, v. CHARLES C. HIGHAM et al.

**Division One, January 14, 1909.**

1. **DEED: Delivery.** Delivery by the grantor to the grantee with the intent to pass the title, and acceptance by the grantee with intent to take the title, are absolute essentials in the execution of a deed.

2. ————: **In Escrow: Depositary.** The depositary of an escrow, strictly speaking, is not an agent at all, but a trustee of an express trust, with duties to perform for both the grantor and grantee which neither can forbid without the consent of the other.

3. ————: ————: ————: **Death of Grantor: Delivery.** The death of the grantor in a deed held in escrow does not annul the depositary's authority to do what he was appointed to do, nor does it impair the right of the grantee to perform the condition and take down the deed.

4. ————: ————: ————: **Delivery.** A deed was made to one of four persons for the benefit of all. He made a warranty deed to two grantees and placed it with a depositary to be delivered to the grantees upon the payment by them for the beneficiaries of $7,000 within a certain time or of $10,000 on or before a later date. No money was paid, but before the option expired the grantor died, and thereafter the option expired, and one of the beneficiaries went to the depositary, who did not know that the grantor was dead, and representing himself to be the grantor's agent requested that the escrow be delivered to him, and that was done, and he receipted for it as the grantor's agent. Afterwards, without the knowledge of two of the beneficiaries, he obtained a quitclaim deed from the grantees to the fourth beneficiary, under the pretext that such deed was necessary to clear the title of record; and he and such other sold the property to one of the defendants, who bought without notice of the

existing rights of the other beneficiaries. *Held*, that there never was'any delivery to the grantees named in the warranty deed. They never had any right to demand it from the depositary, and after the expiration of the option that deed was a dead instrument, and no title passed to its grantees, and none passed by their quitclaim to their grantee; but upon the expiration of the option the title passed back to the grantor in the warranty deed, and upon his death to his heirs or devisees in trust for the same purposes as those for which he had held it.

5. ————: ————: ————: ————: **Innocent Purchaser.** Where the option had expired and the escrow deed had because of that fact become a dead instrument and the depositary as a result of fraudulent representations delivered the deed to a pretended agent of the grantor and such pretended agent obtained a quitclaim from the grantees of the escrow and recorded the escrow, a purchaser from said agent, without notice, is not an innocent purchaser. The depositary of the escrow was not the agent of either the grantor or grantees and did not, wrongfully or otherwise, deliver the escrow to the grantees, and hence a purchaser who traces his title through them, though without notice of the fraudulent representations by which the deed was obtained from the depositary, is not an innocent purchaser.

6. ————: ————: ————: ————: ————: **Knowledge.** Where the holder of an option knows that the person from whom he is about to buy holds the title for the benefit of others, and before the expiration of the option another steps into his shoes and by the advantage which the option affords obtains the property at the option price and the deed is made to him, and he conveys it without consideration to a corporation, the corporation is not an innocent purchaser, although its grantor did not have the personal knowledge that the land was held by his grantor for the benefit of others that the option-holder had.

7. **FRAUD: Clean Hands: Deed in Escrow: Excluding Other Beneficiaries.** To say that plaintiffs have committed an act that the law condemns as fraudulent, merely because it was unlawful and wilfully done, does not always imply that they are not to have a redress of the wrong connected with the same property done by another, or that they come into court with such unclean hands that the court will not hear them. A corporation owned a tract of land and owed debts, and executed its note for $12,500.59 to one of its directors, and secured it by a deed of trust on the land in suit. The note was given to secure a debt of $9,903.15 due four of the directors, and a debt due a bank for $1,724.90 on which they were sureties, and 36 other small debts aggregating $2,597.44, due to as many other stock-

holders. The deed of trust provided that when the land was sold the proceeds should be used to pay all debts *pro rata*. The property was sold under the deed of trust to one of the four who is a plaintiff, who held it for nine years, under a like agreement, and during that time the four directors spent between five and six thousand dollars in taking care of the property, the other 36 contributing nothing, and are not parties to this suit, but apparently have abondoned any claim to the proceeds. At the end of that time the property was conveyed to another of the four directors, under an agreement that he was to sell it and divide the proceeds *pro rata* among the four, thereby cutting out the other 36. Thereafter this grantee entered into an option agreement for the sale of the property and made out and signed a warranty deed naming the option-holders as grantees, and delivered it to a depositary, who was to deliver it to them on the payment of the money, which was never paid, and the escrow deed became a dead instrument. After the death of the grantor in that deed, one of the four, representing himself to be the grantor's agent, induced the depositary to hand over the escrow deed to him, and he thereupon, upon a representation that a deed was necessary to clear the title of record, obtained from the option-holders a quitclaim deed, put it and the other of record, and for a small sum sold the property to a stranger, who is not an innocent purchaser, and the remaining director and the widow and heirs of the deceased one bring this suit to set aside the deed. *Held*, that the deed by the one director to the other for the benefit of the four was in law a fraud, because wilfully done, but under the circumstances was not moral turpitude, and plaintiffs do not come into court with such unclean hands as forestall them from maintaining the suit.

8. **FRAUDULENT CONVEYANCE: Improvements.** A purchaser of land cannot, by placing improvements upon it, infuse any force into his void title; and if he took possession, charged with knowledge of plaintiffs' interests and made the improvements in defiance of those interests, he is not entitled to have their value taken into consideration in a suit to have his void deed set aside, unless they can be removed without injury to the property. And where the real estate is mining property, the injury meant is injury that cannot be repaired by replacing other improvements or equipments of like character at the cost of their present value.

Appeal from Crawford Circuit Court.—*Hon. L. B. Woodside*, Judge.

REVERSED AND REMANDED (*with directions*).

*Ed. L. Gottschalk* and *A. H. Harrison* for appellants.

(1)   A deed delivered without the consent of the grantor has no more effect to pass title than if it were a forgery, or had been stolen.   Houston L. & T. Co. v. Hubbard, 85 S. W. 474.   (2)   Where a deed is delivered as an escrow, it is of no force till the condition is performed.   Goff v. Roberts, 72 Mo. 572.   (3)   A deed left in escrow, and grantee obtained possession of same fraudulently, and then transferred by deed to innocent purchaser, conveys no title to grantee or those claiming under him.   Taylor v. Davis, 72 Mo. 291.   (4)   Where grantor signs and acknowledges a deed and places it among his papers, and it falls into the hands of the grantee, it does not constitute a delivery as to convey the title.   Pitts v. Sheriff, 108 Mo. 110.   (5)   To make a deed effective there must be a delivery, actual or constructive, to the grantee, or to some person for his use, during the lifetime of the grantor.   Standiford v. Standiford, 97 Mo. 231; Ebersole v. Rankin, 102 Mo. 488; Crowder v. Searcy, 103 Mo. 97; Sneathen v. Sneathen, 104 Mo. 201; Allen v. McGroodt, 105 Mo. 442; Hall v. Hall, 107 Mo. 101; Cravens v. Rossiter, 116 Mo. 338.   (6)   A deed takes effect only from proper delivery. Saunders v. Blythe, 112 Mo. 1.   (7)   And must be in the lifetime of grantor.   Sneathen v. Sneathen, 104 Mo. 201; Allen v. McGroodt, 105 Mo. 442.   (8)   Where a voluntary conveyance is delivered to a third person, with instructions to deliver it to the donee in case of the donor's death, and is, after all danger of the donor's death is past, put on record by one who wrongfully obtains possession of it, this does not constitute a delivery, and no title passes.   Boyle v. Boyle, 6 Mo. App. 594.   (9)   Acceptance by the grantee is also essential to the taking effect of the deed.   Ebersole v. Rankin, 102 Mo. 488.   (10)   The maxim ''He who comes into equity must come with clean hands'' is

confined to misconduct in regard to, or at all events connected with, the matter in litigation. Johnson v. Ewald, 82 Mo. App. 286; 1 Pomeroy, Eq. Jur., secs. 399, 403. (11) Nor does it furnish protection to wrong or fraud. Axman v. Smith, 156 Mo. 286; Turner v. Overall, 172 Mo. 271; Bell v. Campbell, 123 Mo. 1; Poston v. Balch, 69 Mo. 115. (12) Notice is actual when the purchaser knows of the existence of the adverse claim or title, or is conscious of having the means of knowing, although he may not use them. Taafe v. Kelley, 110 Mo. 137; Eck v. Hatcher, 58 Mo. 235. (13) Where one cannot make out his title to land except through a deed or other instrument which leads him to the knowledge of another fact, he will be deemed to have knowledge of the fact. Loring v. Groomer, 110 Mo. 644; Mason v. Black, 87 Mo. 341. (14) Where one has the equitable title to land and another obtains the legal title with knowledge of such equity, the former has the superior equity and the latter will be held to hold such legal title in trust for him. Notice of an adverse claim of title is actual when purchaser knows of its existence or is conscious of having the means of knowledge, although he may not use them. Sensenderfer v. Kemp, 83 Mo. 581. (15) A purchaser by a quit-claim deed acquires only the title the vendor had, and the land remains subject in his hands to the equity attaching to it in the hands of the grantor. Schradski v. Albright, 93 Mo. 42. (16) The burden of proving it is a bona-fide purchaser is on the defendant. Connecticut M. Life Ins. Co. v. Smith, 117 Mo. 261. (17) Upon the death of a trustee, the legal title descends to his heirs. Newmann v. Newmann, 152 Mo. 398.

*Xenophon P. Wilfley* and *Harry Clymer* for respondents.

(1) He who comes in a court of equity must come with clean hands. Pomeroy's Equity Jurisprudence, secs. 397, 404. (2) A deed delivered by the grantor to

a third person to be delivered to the grantee, and by such third person delivered to the grantee, will constitute good delivery, though the grantor is dead at the date of the last delivery; for the delivery takes effect by relation as of the date when first made to the third person. Sneathen v. Sneathen, 104 Mo. 201; Marshall v. Hartzfelt, 98 Mo. App. 178. (3) A subsequent purchaser in good faith acquires good title, though his grantor has received his deed from a depositary without performing the conditions upon which such deed was to be delivered. The depositary of the deed is the agent of the grantor as well as the grantee. Jones on the Law of Real Property and Conveyances, sec. 1316.

VALLIANT, J.—This is a suit in equity to set aside certain deeds to land in Crawford county, alleged to have been procured by fraud.

There is little, if any, dispute as to the facts. The land in question is mining property. The Copper Hill Mining & Smelter Company, a corporation, is the source of title. The affairs of that corporation were under the management of a board of directors composed of Phillip Seibel, John Boepple, Conrad H. Meyer and Charles C. Higham. John Boepple has since died and his widow Christine and two children Emma and John are, together with Phillip Seibel, the plaintiffs in this suit, and Meyer and Higham are two of the defendants. The other defendants are Douglas, Thompson, Barnard, Scoble and the Missouri Copper Mountain Mining Company; their respective interests will be shown in the course of the opinion. August 9, 1892, the corporation executed its promissory note for $12,500.59 payable to Phillip Seibel and secured it by deed of trust on the land in question. The note was made to cover various sums of indebtedness, among which were thirty-six items of small amounts aggregating $1,234, owing to persons not parties to this suit; also one note held by Lafayette Bank for $1,724.90, one

note to Meyer $3,207.84, one to Higham $1,567.37, one
to Boepple $1,877.41, one to Seibel $1,516.53 and three
for smaller sums to persons not parties to this suit.
When the $12,500.59 note matured it was not paid and
the deed of trust was foreclosed. At the foreclosure
sale the property was bought in by the plaintiff Phil-
lip Seibel under an oral trust agreement (so the pe-
tition says) that he would hold it for the sole use and
benefit of himself, and Boepple, Meyer and Higham,
but there was no proof of that alleged agreement; on
the contrary the proof shows that the agreement was
that he would hold it in trust for the benefit of all the
creditors whose debts were covered by the deed of
trust, and when the note secured by the deed of trust
was delivered to him he agreed in writing to "devote
the proceeds of said note when paid, or all that may be
realized upon a sale of the property" under the deed
of trust, to the payment *pro rata* of all the several
debts which the note was designed to cover and which
were enumerated in the agreement. The deed from
the trustee to Seibel bears date October 15, 1892, it
recites a consideration of $1,700, but in fact it was
merely nominal. March 8, 1901, Seibel conveyed the
title to John Boepple by deed of that date wherein the
consideration recited is $5,000, but in fact there was no
consideration, except the agreement presently men-
tioned. Boepple at the same time executed a written
acknowledgment that the property was conveyed to
him in trust for Seibel, Higham, Meyer and himself in
equal parts, and that in case of sale he would account
to them in that proportion. Those four agreed to that.
During the period in which Seibel held title, that is,
from October, 1892, the date of the foreclosure sale,
to March, 1901, when the title was transferred to Boep-
ple, the evidence shows that the four parties, Seibel,
Meyer, Higham and Boepple expended a considerable
sum of money, five or six thousand dollars, in taking
care of the property, of which Seibel testified that he

had expended about seven hundred dollars more than either of the other three.

March 14, 1901, Boepple executed a lease of the property to defendants Douglas and Thompson, and gave them possession, and at the same time entered into a written agreement to sell them the property on certain terms. The agreement amounted to what in real estate trade circles is commonly called an option; Douglas and Thompson having the right to purchase the property on or before April 30, 1901, for $7,000, or on or before September 15, 1901, for $10,000. In furtherance of that agreement Boepple signed and acknowledged a document purporting on its face to be a warranty deed conveying the land to Douglas and Thompson, and placed the same in escrow in the hands of the St. Louis Trust Company, to be delivered to Douglas and Thompson if they should by April 30, 1901, pay to the Trust Company $7,000, or by September 15, 1901, $10,000, for Boepple. On placing the document in the hands of the Trust Company Boepple also placed in its hands a paper signed by himself declaring that the money to be paid to the Trust Company by Douglas and Thompson pursuant to the option agreement would, when paid, belong equally to Meyer, Higham, Seibel and himself, and the Trust Company was authorized to so distribute it. All this transaction with the Trust Company was done with the knowledge and consent of Seibel, Meyer and Higham. Before the option expired, that is to say, June 23, 1901, Boepple died testate, leaving his property in proportions named in the will, to his widow and two children who are plaintiffs in this suit. Douglas and Thompson concluded they did not want to purchase the property, they let the period of their option expire. A year after the death of Boepple, to-wit, June 26, 1902, Higham went to the Trust Company and representing himself as agent of Boepple requested that the escrow be delivered to him and it was done; he signed the name

of "John Boepple by W. C. Higham" to the receipt.
He did not inform the Trust Company that Boepple
was dead and the Trust Company did not know that
fact. After Higham got possession of the escrow, he
wrote to Douglas and Thompson, saying that as the
option had expired and the title was in them it would
be necessary for them to execute a deed conveying back
the title, and he enclosed in his letter a draft of a quit-
claim deed to C. H. Meyer, which he requested them to
execute and return to him, which they did. Both Doug-
las and Thompson testified that they had no desire to
purchase the property and that after the option had
expired it was represented to them by Mr. Higham
that it would be necessary for them to quitclaim in or-
der to clear the title on the record, and they thought
it was a friendly transaction in which all the parties
interested were agreeing, therefore they executed the
quitclaim to Meyer.

After the escrow and the quitclaim deed had been
obtained in the manner above mentioned, they were
put on record, and then Meyer and Higham undertook
to find a purchaser for the property. They made a con-
tract with one Graham whereby they gave him an op-
tion on the property for $2,200, he paying $200 down,
for the privilege. After some delay Graham nego-
tiated a sale to one Barnard who paid him the $200
he had already paid and paid Meyer the remaining
$2,000 and took from him a warranty deed. After his
purchase Barnard organized the Missouri Copper
Mountain Mining Company, a corporation of which
he is the president. He then conveyed the property
by deed to Mrs. Scoble and she to the corporation,
there was no consideration for the deed to Mrs. Scoble
or from her to the corporation, these deeds were mere-
ly made for the purpose of passing the title from
Barnard to the corporation.

The evidence shows that neither Seibel, nor Mrs. Boepple, nor her son, nor her daughter, knew anything about the obtaining of the escrow from the Trust Company, nor of the procuring of the quitclaim deed from Douglas and Thompson. While Meyer and Higham were negotiating to sell to Graham they tried to get Seibel and Mrs. Boepple to consent to the proposed sale to Graham, but they refused, and the grant of the option to Graham was made without the consent of Seibel or Mrs. Boepple. Graham procured the purchaser, Barnard, and at Graham's request the deed was made direct to Barnard, the latter paying to Meyer $2,000, which with the $200 already paid by Graham for the option made the total consideration received by Meyer $2,200. Barnard testified that he knew nothing of the title except what was shown by the record, that he had an abstract of the title which he examined and which his attorney examined. All his information about the property he derived from Mr. Graham. He said: "Mr. Graham explained what the property was and Mr. Meyer was. I do not know whether he explained about Mr. Higham or not; I know when the transaction was made Mr. Higham was there at the time and seemed to have something to say, but I was not doing business with Mr. Higham at all. I did not know he was in the transaction at all. I don't think Mr. Graham mentioned Mr. Higham and Mr. Meyer and Mrs. Boepple and Mr. Seibel." The evidence showed that Mr. Graham knew that these four, Seibel, Meyer, Higham and Mrs. Boepple, had interests in the property, but he testified that he did not give that information to Barnard.

The findings of facts by the court are stated in the bill of exceptions, from which it appears that the court was of the opinion that Boepple, at the time of placing the Douglas and Thompson instrument in the hands of the Trust Company as an escrow, held the legal title in trust for all the creditors whose claims were covered by the $12,500.59 note secured by the deed

of trust and the conduct of the four persons, to-wit, Boepple, Seibel, Meyer and Higham, showed a conspiracy to convert the proceeds of the property to the payment of the sums due themselves respectively to the exclusion of the other creditors; that the escrow, obtained as it was from the Trust Company and put on record, was inoperative to pass title; that the doctrine of innocent purchaser was not involved in the case, but that the plaintiffs were seeking to enforce an equitable title which originated in a fraudulent and inequitable transaction, therefore they came with unclean hands and were not entitled to equitable relief; therefore their bill was dismissed.

I.  Before proceeding to adjust the equities in the case let us find where the legal title to the property in question now is.  It was in Boepple in his lifetime, subject to pass to Douglas and Thompson upon the delivery of the escrow to them by the Trust Company. Did the title pass when Higham obtained possession of the escrow under the circumstances above stated? Blackstone defines a deed to be "a writing sealed and delivered by the parties." [2 Blackstone, *p. 295.] Delivery is not only essential but it is the final act that consummates the deed.  Delivery by the grantor to the grantee with the intent to pass the title and acceptance by the grantee with the intent to take the title are absolute essentials in the execution of a deed.  Delivery may be made through the hands of an agent and acceptance may be made through the hands of an agent, but, in whatever form it is done, there must be a giving by the grantor and a receiving by the grantee, with the mutual intent to pass the title from the one to the other.  [McNear v. Williamson, 166 Mo. 358.]

If a deed be delivered by the grantor to a third person to be delivered to the grantee, without condition or contingency, and be by that person delivered to the grantee, even after the death of the grantor, the title

will pass; the transfer of title will take effect as of the
date of the delivery to the third person. But in such
case it must appear that the grantor at the time he de-
livered the deed to the third person intended it to take
effect as a present transfer. [Sneathen v. Sneathen,
104 Mo. 201, l. c. 209.] And if a deed be delivered to a
third person to be delivered to the grantee on the
death of the grantor, and it be by that person so de-
livered, the title will pass. [2 Jones on Real Property,
sec. 1309.] But in neither of those cases was the in-
strument an escrow, because the delivery to the third
person to be delivered to the grantor was without con-
dition and the instrument was beyond the recall of the
grantor. "The distinctive feature of an escrow is the
delivery of a deed to a third person to await the per-
formance of some condition whereupon the deed is to
be delivered to the grantee and the title is to pass."
[Id., sec. 1302.] In such case it is not a deed until the
condition is performed. The depositary of an escrow
is sometimes spoken of as the agent of the grantor and
sometimes as the agent of both parties, and whilst
that may be correct, in a limited sense, yet strictly
speaking he is not an agent at all, he is a trustee of
an express trust, with duties to perform for each which
neither can forbid without the consent of the other.
If he were the agent of the grantor his agency would
cease on the grantor's death and he would have no
authority to receive the purchase  money from the
grantee and deliver the deed. But the death of the
grantor does not annul the depositary's authority to
do what he was appointed to do and it does not im-
pair the right of the grantee to perform the condition
and take down the deed. [2 Jones on Real Prop., sec.
1312.] Boepple in his lifetime could not have with-
drawn the escrow from the Trust Company without the
consent of Douglas and Thompson before the expira-
tion of the period of their option, but after that period
had elapsed he could have done so. Boepple died be-

fore the period of the option expired. Douglas and Thompson declined to avail themselves of their privilege to purchase and allowed the option to expire. The paper in the hands of the Trust Company then lost its vitality, and the Trust Company might have destroyed it without injury to anyone or it might have given it to Boepple's heirs to be destroyed, but, in whosesoever hands it was, it was a dead instrument. In that stage of the case Higham went to the Trust Company and representing himself to be the agent of Boepple, concealing the fact that Boepple was dead, demanded and received the paper from the Trust Company, signing Boepple's name to the receipt. That of course he had no right to do. Even if he had, by false representation during the life of Boepple, obtained possession of the paper and had delivered it to Douglas and Thompson, without the performance of the conditions by them, it would have conveyed to them no title; in such event the legal effect on the title would not have been different if the paper had been stolen from the desk of the depositary. [2 Jones, R. P., sec. 1315.] By what we have just said in relation to the legal effect of the paper after it had come into the possession of Higham, it is not intended to say that there was no difference, viewed from a moral standpoint, between the act done and the stealing of the paper, for, from that standpoint, in this case there is a difference. Higham testified that he thought he had a right to do what he did, and if he really thought so his opinion was not altogether without foundation, because he owned a considerable interest in the property, was active in negotiating the Douglas and Thompson option and in the placing of the paper in the hands of the Trust Company; he was perhaps ignorant of the law and did not know that if he had ever been the agent of Boepple the death of Boepple terminated his authority. But, whatever he may have thought as to his rights or his authority, his act was unlawful. Even after he received the paper from

Douglas and Thompson he did not deliver it to them, they have never had it in their possession, they never authorized him to receive the deed for them and they have never claimed to have any title under it; they were induced to execute the quitclaim to Meyer on the statement to them by Higham that it was necessary to clear the title on record. All this may have been done under a mistaken view of the law, but if so it was all unlawful. We hold that no title passed to Douglas and Thompson and none by their quitclaim to Meyer. The legal title therefore remained in Boepple until his death and at his death it passed to his heirs or devisees in trust for the same purposes that he had held it.

II.    Respondents contend that even if Meyer had no title, the present corporation, the Missouri Copper Mountain Mining Company, is an innocent purchaser for value and its title must be protected.

The argument in support of that claim proceeds on the theory that the Trust Company was the agent of the grantor and if wrong has been done it was the fault of the grantor in selecting a careless agent, and that if one of two innocent persons must  suffer it should be that one through whose act the wrong was permitted. As we have already said, the depositary of the escrow is not, strictly speaking, the agent of either of the parties, though in a limited sense he may be considered the agent of both, but the law of agency is too remote from the status of the depositary of an escrow to govern the case. In this instance the depositary did not, wrongfully or otherwise, deliver the escrow to Douglas and Thompson. The circumstances indicate that the Trust Company considered it a dead instrument and returned it to one who appeared to be acting for the grantor and interested only in its destruction. A case might arise, between a grantor and the assignee of a grantee who had fraudulently ob-

tained possession of the escrow, in which the grantor's conduct might be condemned as so negligent that he could not in good conscience gainsay the assignee's title derived from the fraudulent grantee, but no such case now occurs to us, nor do the facts of this case justify any such inference. Here the grantor was dead and there was no misconduct or neglect on his part to be inferred. There is no hint of an improvident or careless selection of a depositary. This court has held that where a grantee in an escrow fraudulently obtained possession of the instrument and placed it on record, no title passed to him, nor to an entirely innocent purchaser under him. [Taylor v. Davis, 72 Mo. 291.] There was more cause to consider the purchaser an innocent one in that case than in this. We hold that under the circumstances of this case the title of the defendant corporation is not beyond accountability to the plaintiffs for their interests in the property even if the defendant had bought without notice of those interests.

III. Is the defendant corporation that now holds the title an innocent purchaser? Whatever right it has to that distinction is derived from Mr. Barnard; the deeds from Barnard to Mrs. Scoble and from her to the defendant corporation were without consideration, and were designed only to pass to the corporation the title which Barnard acquired from Meyer.

After Higham had acquired possession of the escrow and had obtained from Douglas and Thompson the quitclaim deed to Meyer and had put both instruments on record, he and Meyer undertook to find a purchaser for the property and at last negotiated an option to Graham for $2,200, for which option Graham paid $200 down, that is, he paid that much of the proposed purchase money, to be forfeited if he should fail to pay the balance. He let the period of his option pass without exercising it, then he asked for an exten-

sion which after some negotiations was finally agreed to and the right to purchase at that price was extended ten days. During that extended period he induced Barnard to buy the property at the option price. In his testimony, referring to Mr. Graham, Mr. Barnard said: "He (Graham) paid two hundred dollars on this option and I paid him that back; I was not continuing the option, I was buying the property." And Mr. Graham testified: "I claim that Mr. Barnard purchased that altogether independent with my rights in the premises and he simply repaid me or made me good for what I paid on account." These quotations from their testimony are made to show that they both tried to convey the idea that Barnard's purchase was independent of Graham's option, but that is only their opinion of the legal effect of the transaction, the facts do not justify the opinion. The facts are that after Graham obtained the extension and within that extension he approached Barnard and solicited him to advance the money to purchase on the terms of the option, and within that extension Barnard closed the transaction by paying Meyer $2,000 and Graham the $200 he had paid on the option. Barnard testified that when Graham spoke to him about buying the property he told him he had an option on it, and showed him the paper, it was signed by Meyer. Graham testified, "When this option was finally closed out the title to the property was taken in the name of Mr. Barnard." Graham had the right, under his option, to buy the property by paying $2,000 in addition to the $200 he had already paid, and at the closing of the transaction he was there prepared with the help of Barnard to exercise that right of purchase at that price, and he did exercise it, directing the deed to be executed to Barnard instead of himself. Whether Barnard could at that time have bought the property for that price, if Graham had not had the option, we do not know; we only know that with the option he did obtain the property by paying

$200 to Graham and $2,000 to Meyer, and that he availed himself of the Graham option in the transaction to get the property at that price. That put him in Graham's shoes. When Graham bought his option he knew that Meyer held the title in trust for himself, Higham, Seibel and the Boepple heirs or devisees, as their respective interests might appear, and he also knew that Seibel and Mrs. Boepple were not consenting to the sale to him. If Graham had first concluded his purchase and had placed his deed on record and had afterwards negotiated an independent sale to Barnard, who had bought knowing nothing except what the record showed, we would have had a different case. Under the circumstances of this case we hold that Barnard was not an innocent purchaser. In fact instead of being an innocent purchaser, he and Graham are rather in the attitude of conspiring with Meyer and Higham to wrong Seibel and the Boepple heirs.

IV. The learned chancellor was of the opinion that the plaintiffs' claims, which they were seeking by this suit to enforce, were founded on a conspiracy between Seibel, Boepple, Meyer and Higham to defraud the other creditors of the Copper Hill Mining Company whose claims were covered by the deed of trust and for that reason dismissed their bill.

There is no maxim which a court of equity more unequivocally insists upon than that he who comes asking its aid must come with clean hands. A court of equity will not aid a party to commit a fraud. One difference between a court of law and a court of equity is that in the one tribunal legal rights usually prevail while in the other something more is required; the cause, besides having the law on its side, must commend itself to good conscience and justice; if it have only law on its side, equity will generally leave it to be disposed of in a court of law. But a court of equity will look into the very spirit of the transaction and de-

cide for itself whether a cause, otherwise meritorious, is based on such a dishonest purpose as to justify a refusal to entertain it.

On the 9th day of August, 1892, when the $12,500.-59 note was delivered to Seibel he signed a paper agreeing to devote the proceeds of the note when paid, or the proceeds of the sale under the deed of trust, to the payment *pro rata* of all the claims of creditors covered by the note. He became the purchaser at the foreclosure sale in October, 1892, and held the title until March, 1901, nearly nine years, when he transferred it to Boepple. This transfer to Boepple was pursuant to an agreement between the four, Seibel, Boepple, Meyer, and Higham, to the effect that Boepple should hold the title in trust for them, and Boepple signed a trust agreement to that effect, agreeing to divide the proceeds of a sale of the property equally between the four. To the extent that that agreement was designed to cut out the other creditors it was fraudulent in the sense that it was a wilful doing of an unlawful act and, as between themselves, Seibel and Boepple were no more or no less to blame than Meyer and Higham. But to say that one has committed an act that the law condemns as fraudulent, merely because it was unlawful and wilfully done, does not always imply that the party was guilty of moral turpitude. In the every-day struggle for gain in business transactions, men, morally blinded by their own interests, often excuse themselves by construing the circumstances under which they are placed as justifying acts which if viewed from a disinterested standpoint they would condemn. There were circumstances in this case which, if not justifying these four men in what they did, at least offered a not unreasonable excuse for their act, in a moral if not a legal sense. Of the $12,500.59 note covered by the deed of trust $9,903.15 were owing to these four men. In that estimate is included a note of $1,724.90 held by the Lafayette Bank, but on which Boepple, Seibel and

Meyer were endorsers. The rest of the $12,500.59 note, to-wit, $2,597.44, was made up of small sums owing to thirty or forty different persons who were also stockholders in the Copper Hill Corporation. The corporation was insolvent and in a bad way financially. The property required care and expense to preserve it and the evidence showed that between the date of the trustee's foreclosure sale at which Seibel became the purchaser in October, 1892, and the date of the transfer of title from Seibel to Boepple in 1901, these four men had expended five or six thousand dollars in taking care of the property. During all that time these other creditors took no notice of the property and contributed nothing to its care. In fact, those creditors are not complaining now so far as the record shows. If we may assume that they have paid any attention to it, we must conclude that they are tacitly acquiescing in what has been done. If the amount that these four men expended in taking care of the property be added to the amount due them in the mortgage note, the sums would aggregate considerably more than the total debt covered by the deed of trust.

The amount so advanced to take care of the property was approximately twice as much as was owing to all the thirty or forty other creditors, and considering the comparatively small sums due each of those it is not to be wondered at that they did not take any further notice of the property or trouble themselves to preserve it. We are not intending to convey the idea that we find any excuse for crowding them out on account of the smallness of their claims, but we are intending to say that if these four men came to the conclusion that they ought in justice to be paid for their outlays for taking care of the property before those other creditors and, knowing that the property would not bring enough to pay them and pay the others also; if they concocted a plan to appropriate to themselves all that they could get for the property, whilst the plan

was not legal and therefore was a technical fraud, yet we find no moral wrong in the act.   In fact, if these four men, instead of taking the remedy in their own hands, had come with their petition into a court of equity stating the facts and asking that, when the property came to be sold, they should be reimbursed for necessary expenditures made for its preservation out of the proceeds of the sale before the debts secured were paid, the chancellor would have been apt to consider their prayer a reasonable one.   The last bottomry bond on a ship and its cargo is given priority over former ones in courts of admiralty on the theory that the last was necessary to preserve the property for all interested. That is a principle of equity.   The fact of those advancements to preserve the property during the nine years the title was held by Seibel, during all which time they were trying to sell but could not, came out in the trial rather incidentally than purposely, but it was shown by the evidence and was not disputed.   If the price paid by Barnard is to be taken as the fair value of the property it was not sufficient to pay for its keeping, much less to pay anything on the mortgage debt. Under all the circumstances we do not think that the plaintiffs' cause is so lacking in merit or so darkened with fraud as to justify a dismissal of their bill.

V.   Defendants introduced evidence over plaintiff's objection, tending to show that since the defendant corporation has been in possession of the property it has placed on it improvements to the value of twenty thousand dollars or more.   The nature of the alleged improvements, whether they consisted of permanent buildings or moveable machinery, whether or not they really added value to the property, was not shown. Defendant corporation could not, by placing improvements on the property, infuse any force into its void title, and since the defendant took possession charged with knowledge of plaintiffs' interests and made what-

ever improvements it did make in defiance of those interests, it is not entitled to have those improvements taken into account in the adjustment of the equities growing out of these complicated transactions, unless the improvements can now be removed without injury to the real estate as mining property.   Of course, if they are valuable improvements or equipments to the mining plant their removal would necessarily reduce the value of the plant as it now stands, taking the improvements or equipments into account, but by the term injury to the real estate as mining property used in connection as above we mean injury that cannot be repaired by replacing other improvements or equipments of like character at the cost of their present value.

As we have already said, the legal title to the property was in John Boepple subject to the trust agreement signed by him that he would divide the proceeds of the property when sold equally between Seibel, Meyer, Higham and himself.   He died holding that title subject to that trust and the title descended to his heirs or devisees and there it remained when this suit was begun.   As to the numerous other creditors whose claims were covered by the original deed of trust, they are not parties to this suit and can take no part in the decree.   They have never asserted any claim, have given no attention to the property, have never even made any demand on the trustee.   The circumstances indicate that they have abandoned whatever original rights they may have had.   It has now been fifteen years since the foreclosure of the deed of trust.   It is probable that each thought his claim was not worth the trouble and cost of a lawsuit.   At all events they are not here asking for anything and any decree that may be rendered in this cause can neither benefit nor injure them.   As to defendants Meyer and Higham, they are asking nothing at the hands of the court and they would be entitled to noth-

ing if they were asking, because they have already helped themselves. They sold the property (or attempted to do so) to Barnard and got from him the purchase price; that transaction closed out all their interest. But whilst their deed to Barnard conveyed no title to the property, yet it did convey to him whatever rights they had in the proceeds of the property when it should be sold, which were two-fourths, the other two-fourths being one in Seibel and one in the Boepple heirs or devisees. The debts due to Meyer and Higham in the original deed of trust were somewhat larger than those to Seibel and Boepple, but when the property was conveyed by Seibel to Boepple the four parties agreed that their respective interests should be equal; it may be that in equalizing their interests they took into consideration the advances made to preserve the property during the nine years the title was held by Seibel, but however that may have been they agreed to equality and that is sufficient.

In so far as any claim that either party may have to especial favor at the hands of a court of equity, we do not discover that one stands in any better light than the other. The conduct of each shows that he was seeking his own interest and leaving every one else to take care of himself. Therefore when it comes to making an equitable division of the property among them we find neither entitled to especial consideration over the others. It would neither be right to give the plaintiffs the benefit of the defendant's improvements if it can be avoided, nor would it be right to allow the defendants by tearing away and removing their improvements to injure the real estate as mining property. Besides, as against these alleged improvements is to be considered the fact that the defendants have been in possession of the property several years and if they have made profit out of it, the property has to that extent paid for the improvements.

The most equitable adjustment that we can make of these interests is as follows:

The judgment is reversed and the cause remanded to the circuit court with directions, to cause an account and inventory to be taken showing in detail the character, quantity, original cost, present value and present condition of the improvements, machinery and equipments placed on the property by the defendant corporation since it came into its possession; showing also the present value of the property with the improvements and its present value without the improvements, and whether or not the improvements are in their nature permanent and enhance the value of the property; showing also whether or not in whole or in part, and if in part what part, the improvements can be removed and the effect on the land as mining property of the removal; and showing also the profits, if any, made by the defendant corporation out of the property since it came into possession. And if on the coming in and confirmation of the account it should appear that the present value of the improvements is greater in value than the profits so found, the court will by an appropriate order permit the defendant corporation, if it sees fit to do so, to remove the improvements to the extent of the present value thereof over the profits so found, provided the court finds that the same can be removed without injury to the land as mining property as that term is above explained in this opinion, such removal to be made at the defendant corporation's expense and within such time as the court may name. But if on such accounting the profits so found equal or exceed the present value of the improvement, machinery and equipments, no removal will be allowed. After removal in part as above prescribed, if there should be such removal, the court will estimate to what extent the improvements not removed enhance, if at all, the value of the land as mining property or, if there should be no removal, then the

court will estimate that to what extent the improvements as a whole enhance, if at all, the value of the land as mining property, and then the court will enter a decree that the property in question, describing the land as it is described in the petition, and the improvements remaining (or the improvements as a whole if there should be no removal) be sold by the sheriff of the county at public auction to the highest bidder for cash and after deducting the court costs and costs of sale divide the proceeds of the sale as follows: find the proportion that the value of the improvements that are sold with the property, bears to the present value as the court may find it, of the whole property and set apart to defendant corporation the same proportion of the net proceeds of the sale and the rest of the proceeds divide into four parts, giving one-fourth to the plaintiff Seibel, one-fourth to Mrs. Boepple as executrix of the will of John Boepple and the remaining two-fourths to the defendant corporation; provided, however, that if the court on the accounting should find that the profits derived from the operation of the property equal or exceed the value of the improvements no part of the proceeds of the sale will be set apart to defendant corporation on account of the improvements, but the proceeds will be divided in four equal parts as above prescribed, one-fourth to plaintiff Seibel, one-fourth to Mrs. Boepple as executrix, and two-fourths to the defendant corporation. The sale to be made within sixty days from the date of the decree and on such notice as to time, terms and place as are prescribed by law for sales of real estate by the sheriff under execution; the sale is to be by the sheriff reported to the court for its rejection or confirmation, and if rejected the court will order a resale; on confirmation of the sale by the court the sheriff will execute to the purchaser a good and sufficient deed of conveyance. *Graves* and *Woodson, JJ.,* concur; *Lamm, P. J.,* not sitting.