TOBEY et al. v. KILBOURNE et al.

(Circuit Court of Appeals, Ninth Circuit.    May 3, 1915.)

No. 2531.

1. APPEAL AND ERROR ⊜⟺1009—REVIEW—FINDINGS—EQUITABLE SUIT.

The trial court's findings in a suit in equity are presumptively correct, and will not be disturbed on appeal, unless an obvious error has intervened in the application of the law, or serious or important mistake has been made in consideration of the evidence, especially in a case in which the testimony was taken in open court, so that the trial court had the opportunity of observing the demeanor of the witnesses, while the appellate court has before it only a condensed printed statement of the evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3970–3978; Dec. Dig. ⊜⟺1009.]

2. VENDOR AND PURCHASER ⊜⟺220—FRAUD—BONA FIDE PURCHASER—PURCHASER OF EQUITY.

The defense of bona fide purchaser without notice is not applicable to the purchase of an equity only in land.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 461–465, 720; Dec. Dig. ⊜⟺220.]

3. VENDOR AND PURCHASER ⊜⟺220—FRAUD—BONA FIDE PURCHASER—ASSIGNEE OF CONTRACT.

Where a contract for the purchase of land was procured by fraud, but was assigned to an innocent purchaser, and by agreement of all the parties the deed was made directly to the assignee, he can defend as a bona fide purchaser, the same as if the deed had been made to the original purchaser and the land then conveyed to the assignee.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 461–465, 720; Dec. Dig. ⊜⟺220.]

4. VENDOR AND PURCHASER ⊜⟺242—FRAUD—BURDEN OF PROOF—BONA FIDE PURCHASER.

In a suit to set aside a conveyance for fraud, the burden of proving the defense of bona fide purchaser is on the defendant.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 603–605; Dec. Dig. ⊜⟺242.]

5. VENDOR AND PURCHASER ⊜⟺229—FRAUD—BONA FIDE PURCHASER—CONSTRUCTIVE NOTICE.

To affect a bona fide purchaser for value of land with constructive notice of fraud by his predecessor, the means of knowledge must be such that it was gross or culpable negligence not to acquire the knowledge; it not being sufficient that he could have obtained the knowledge by prudent caution.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 477–494; Dec. Dig. ⊜⟺229.]

6. VENDOR AND PURCHASER ⊜⟺244—REMEDIES OF VENDOR—FRAUD—SUFFICIENCY OF EVIDENCE—NOTICE.

In a suit to recover land from the assignee of the original purchaser because of fraud in procuring the contract, evidence held to sustain a finding that the assignee had no notice of the fraud at the time he paid the consideration therefor.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 609–611; Dec. Dig. ⊜⟺244.]

Appeal from the District Court of the United States for the District of Oregon; R. S. Bean, Judge.

⊜⟺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit by Frank L. Tobey and others against Edward C. Kilbourne and others to set aside a conveyance of land for fraud. Decree for the defendants, and plaintiffs appeal. Affirmed.

The appellees were the principal stockholders of the Kilbourne & Clark Company, a corporation of Seattle, Wash., engaged in furnishing electrical supplies, machinery, and installing pumping plants for irrigation projects. De Larm and Biehl were the managers and the principal stockholders in the Columbia River Orchards Company, which had an irrigation project at Wahluke, in Washington. To finance the project they had issued $300,000 of bonds, of which a trust company at Seattle was the trustee. In 1910 De Larm, for his corporation, made a contract with Kilbourne & Clark Company, whereby the latter was to build a concrete pumping station and install the necessary machinery thereat, including pipes from the Columbia river to the irrigation ditch. The building of the irrigation ditch was let to another contractor. Before proceeding with the contract the appellees inquired of De Larm concerning the financial resources of his company, and De Larm made a statement showing apparent net assets of about $600,000 over and above debts, including the bond issue above referred to. The appellees made inquiry of others, and obtained verification of De Larm's statement concerning the bonds. They proceeded with the contract, and expended thereon about $47,000, upon which De Larm made payments of about $4,000. In July, 1910, the appellees ceased work, for the reason that De Larm could not pay them as the work progressed, and as provided in the contract.

The appellants owned 4,350 acres of land in Gilliam county, Or., with an equipment of tools, machinery, and stock for operating the same. They entered into negotiations with De Larm with a view to selling said property to his company. De Larm, at his own expense, took E. C. Kilbourne, as a soil expert and irrigation engineer, to inspect the land. This was in February, 1911. De Larm proposed to buy the land and to pay for the same with the bonds of his corporation. W. L. Tobey, one of the appellees, went to Seattle to investigate the bonds, and while there talked with several persons whose names had been suggested to him by De Larm. The information which he received was to the effect that, if the securities behind the bonds had to be sold, the bonds would realize about 80 per cent. of their face value. The appellants had offered the land and its equipment for sale at $120,000. After the investigation made by W. L. Tobey, they demanded more bonds as the purchase price, and the result was that a contract was made whereby they were to receive $140,000 in bonds. On March 4, 1911, deeds to the lands were made out, and were placed in escrow until March 24, 1911. In the meantime, about March 6th, De Larm proposed to Kilbourne that he take the land in payment for the debt of the irrigation company to Kilbourne & Clark Company of $43,000, and in further payment of the expense of the Kilbourne & Clark Company in proceeding and finishing the plant at Wahluke. On March 8th an understanding was reached whereby the appellees were to take the ranch as security for the claim of their company, and for the expenses that they would incur in finishing the plant. Subsequently the agreement was changed, and the appellees agreed as individuals to assume the $43,000 debt which was owing to their company, and as individuals they agreed to complete the pumping plant at Wahluke, the estimated cost of which was about $16,000. They also agreed to install a second pumping unit at the demand of De Larm. In consideration thereof, De Larm agreed to turn over to them the land in controversy, and the equipment of the same, and to pay a debt of $7,500 which Kilbourne & Clark owed the Puget Sound Bridge & Dredging Company, and a debt of $2,200 which the appellees' corporation owed the Moran Company. There were other details of the agreement which need not here be referred to. The deed conveying the land to E. C. Kilbourne was delivered to him on March 24, 1911, and he shortly thereafter deeded the land to C. A. Kilbourne. The appellees thereafter carried out their agreement with the irrigation company. In September, 1911, De Larm proposed to the appellees that they place a second mortgage of $17,500 on the land in controversy, and that of the money so obtained $10,000 should be paid De Larm, in consideration for which he would release

them from their obligation to install the second unit and from their obligation to complete the intake, the $7,500 remaining of the money realized on the mortgage to be paid to the Puget Sound Bridge & Dredging Company in consideration of their release of the lien which they had placed on the pumping plant. This proposition was assented to. The mortgage was placed of record, but $7,500 of the money realized thereon was never paid to the mortgagor. De Larm received $10,000 of the money, but no money was paid to the dredging company. Early in 1912 the Columbia River Orchards Company's scheme collapsed. De Larm had gone wrong, and he became a fugitive from justice, leaving the irrigation project overwhelmed with additional issues of bonds and forged securities. Thereafter the appellants, finding their bonds worthless, brought the present suit, charging the appellees as co-conspirators with De Larm in a scheme to defraud, and alleging that De Larm had falsely represented to the appellants that the bonds were secured by mortgages to the value of 125 per cent. of the bonds issued, and that the bonds were further secured by land contracts, and that the irrigation company owned some 4,000 acres of land, and had options upon 10,000 acres of railroad lands, all within the project, which allegations were false, and known by De Larm to be false. The appellants alleged that they relied upon these representations and believed them to be true, and were induced thereby to convey their land. They alleged that the appellees had knowledge of the fraud and were parties thereto. The appellees in their answer alleged that, if there was any fraud, they had no knowledge or notice thereof, that they paid a valuable consideration for the land, and that they were therefore innocent purchasers for value without notice, and that they fully complied with their contract with the Orchards Company, without any knowledge, notice, or suspicion of any of the frauds alleged in the bill.

The court below found that there was fraud as alleged in the bill, but found that the appellees were innocent purchasers for value without notice, and dismissed the bill.

A. C. Woodcock, E. R. Bryson, R. S. Smith, John M. Williams, and Louis E. Bean, all of Eugene, Or., for appellants.

C. E. S. Wood and Erskine Wood, both of Portland, Or., for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The court below, upon the evidence, found that the appellees were not parties to the fraud, and that they knew nothing about it until long after they had paid the full consideration which they agreed to pay for the property; that they did not know the amount of bonds issued by the Orchards Company, or the securities behind the bonds, or the truth or falsity of any representations made by De Larm or others concerning the same, or the details of the transactions between the appellants and De Larm; that in compliance with their agreement when they took the deed to the land the appellees assumed and paid a debt of about $43,000 due the Kilbourne & Clark Company from the Orchards Company, completed the pumping plant at an expense of $16,000 or $17,000, and paid De Larm $10,000, all before they had any notice or knowledge of the alleged fraud; that during the time covered by these transactions, the bonds of the Orchards Company were generally regarded as valid securities, and were being repeatedly exchanged at par for property in Seattle and elsewhere; and that the appellees paid for the property an amount not so disproportionate to its value as to amount to a fraud, and paid the same in good

faith and without notice or knowledge that the property had been obtained by De Larm from the appellants through fraud and deceit.

[1] It is the established rule that the findings of the trial court in a suit in equity must be taken as presumptively correct, and that unless an obvious error has intervened in the application of the law, or some serious or important mistake has been made in the consideration of the evidence, the findings will not be disturbed by the appellate court. This rule is especially applicable in a case in which, as here, the testimony was taken in open court, where the trial court had the opportunity to observe the demeanor of the witnesses and their manner of testifying, and the appellate court has before it only a condensed printed statement of the evidence as it is presented under the new equity rule. Thorndyke v. Alaska Perseverance Mining Co., 164 Fed. 657, 90 C. C. A. 473; Brandt v. United States, 198 Fed. 449, 117 C. C. A. 208; Harper v. Taylor, 193 Fed. 944, 113 C. C. A. 572.

[2] It is contended that the decree of the court below involves error of law, in that it disregards the rule that one who purchases merely an equity cannot be a bona fide purchaser. It is true that the defense of bona fide purchaser without notice is not applicable to the purchase of an equity; but that principle is not applicable here; for the reason that the appellees purchased no equity, but purchased the legal title to the property in controversy. The contention would seem to be based upon the first agreement between the appellees and De Larm, which contemplated the conveyance of the property to the appellees as security only; but that agreement was changed before the appellants made their deed, and the result of the changed agreement was that all of De Larm's interest in his contract with the appellants was transferred to the appellees for a valuable consideration, and the deed was made directly to them.

[3] But it is said that where, by virtue of the assignment of a contract procured by fraud and by direction of the defrauding party, the deed is made directly to a third person, such third person will stand in no other or better position than the defrauding party, and is not an innocent purchaser. We know of no principle of law upon which that proposition can be sustained. The appellants cite in its support Torrey v. Buck, 2 N. J. Eq. 366, Seibel v. Higham, 216 Mo. 121, 115 S. W. 987, 129 Am. St. Rep. 502, and Bonelli v. Burton, 61 Or. 429, 123 Pac. 37. In the case first cited the court held that the mere substitution of the name of another person as the grantee in a deed, at the instance of the original contractor, cannot place that person in the position of a bona fide purchaser without notice. But it does not appear in that case that the person whose name was thus substituted was without notice of the fraud practiced by the contractor. Both parties joined in the answer to the bill, and it would seem from the opinion that the court dealt with them as conspirators. In Bonelli v. Burton the court said:

"Burton did not allege in any answer that he was an innocent purchaser, for a valuable consideration, without notice. * * * The answer was insufficient in the particulars noted; and, such being the case, the court properly disregarded all testimony on that subject."

In Seibel v. Higham, the person to whom the deed was made was held to be not an innocent purchaser, for the reason that the evidence showed him to be a coconspirator with other parties to wrong the plaintiff. Cases holding the contrary are McCleery v. Wakefield, 76 Iowa, 529, 41 N. W. 210, 2 L. R. A. 529, Hall v. Kary, 133 Iowa, 468, 110 N. W. 930, 119 Am. St. Rep. 639, Augustine v. Schmitz, 145 Iowa, 591, 124 N. W. 607, and Clemmons v. McGeer, 63 Wash. 446, 115 Pac. 1081.

The controlling facts here are that, at the time when the appellees purchased the property and received their deed, De Larm had a contract with the appellants by which the latter were to convey the property to the Orchards Company in consideration of bonds of that company. The transfer so contemplated in the contract, instead of being made by a conveyance to De Larm, and a second conveyance from him to the appellees, was accomplished, with the assent of all parties, by a deed directly from the appellants to the appellees. But the situation is precisely the same that it would have been if two conveyances had been made, instead of one, and we think the court below properly so held.

[4] It is urged that the appellees have not met the requirement of the rule that where fraud is proved, and a defendant relies upon the defense that he is a bona fide purchaser, he must allege and prove that he was a bona fide purchaser for a valuable consideration paid by him, without notice of the fraud or of such facts as would put a reasonably prudent man upon inquiry, and that the burden of proof is on him to establish the defense. In this case the appellants in their bill of complaint anticipated and negatived the defense that the appellees were bona fide purchasers for value. It has been held that in such a case the burden of proof is placed upon the plaintiff. Verner v. Verner, 64 Miss. 184, 1 South. 52. But in the federal courts it may be doubted whether, in a case of this kind, the burden of proof is, by the condition of the pleadings, ever shifted from the defendant. The rule is that the defendant must allege that the purchase was bona fide and that the consideration was actually paid prior to the receipt of notice of the fraud. Boone v. Chiles, 10 Pet. 177, 9 L. Ed. 388; Simmons Creek Coal Co. v. Doran, 142 U. S. 437, 12 Sup. Ct. 239, 35 L. Ed. 1063; Johnson v. Georgia Loan & Trust Co., 141 Fed. 593, 72 C. C. A. 639; United States v. Hill (D. C.) 217 Fed. 841; United States v. Brannan, 217 Fed. 849, 133 C. C. A. 559.

[5] And it is not held in the federal courts that notice of facts such as would put a reasonably prudent man upon inquiry is constructive notice of the fraud. The rule of those courts is that, where it is sought to affect a bona fide purchaser for value with constructive notice, the question is not whether he had the means of obtaining, and might by prudent caution have obtained, the knowledge in question, but whether his not obtaining it was an act of gross or culpable negligence. Wilson v. Wall, 6 Wall. 83, 18 L. Ed. 727; United States v. Detroit Lumber Co., 200 U. S. 321–333, 26 Sup. Ct. 282, 50 L. Ed. 499; Reed v. Munn, 148 Fed. 737, 80 C. C. A. 215.

[6] It is said that the failure of the appellees to testify to lack of

knowledge prior to the performance of their contract, and prior to their release from the contract to install the second unit, warrants a presumption of notice of the fraud practiced by De Larm upon the appellants. In considering this contention we first inquire: What was the fraud? According to the bill it was the false representation that the bonds were secured by mortgages to the value of 125 per cent. of the amount issued, and were also secured by land contracts, and that the Orchards Company owned 4,000 acres of land, and had options on 10,000 acres of railroad lands within the project. There is nothing whatever in the testimony to show that the appellees were ever aware of any representations made by De Larm to the appellants, and it is not contended that they had such knowledge. But the effort of the appellants is to show that the appellees must have known, before they completed their contract with the Orchards Company, that the bonds transferred to the appellants in payment for their property were practically valueless. The court below credited the appellees' testimony to the contrary, and although that testimony is not as explicit and direct as it probably would have been if the issues had been differently framed, we find sufficient in the evidence to support the conclusion of the court below. C. A. Kilbourne testified that neither he nor his corporation, directly or indirectly, had any connection with De Larm or his projects, other than their contract to build the pumping plant, and that he knew nothing about the value of the bonds. "I knew that they had a good proposition, and supposed there was $300,000 authorized, and that the property ought to be perfectly good for that issue." He testified that he had had no experience in handling bonds, never owned one in his life. In answer to the question whether, in dealing with a corporation claiming to own property, where it claimed that its resources consisted of real estate, it would not be his duty as a business man to investigate, he said:

"It might be. It would vary under different circumstances, according to the degree of confidence I had in them, and I certainly had a good deal in Mr. De Larm. At that time he impressed me very favorably indeed."

And when asked about the Orchards Company's delay in paying the appellees, he said:

"They showed at the time a very plausible reason for not paying then, but made assurances which seemed to be all right that they would be able to pay in a very short time—a few weeks. * * * I knew that, if they could sell enough bonds to pay for their plant, they would then be in very excellent shape as far as I knew."

When asked as to his knowledge up to the time that the Orchards Company's scheme collapsed that they were unable to negotiate their bonds for money, he answered:

"No, I didn't know they were not able to. I knew they had not sold any so far for cash; that is, that I knew of."

Again, he testified:

"I thought they had the basis of a fine proposition there, and it was only a matter of being able to dispose of their securities when they would pay us and go along splendidly."

In speaking of De Larm, he testified:

"He made a great many promises that he never carried out, and still he had a way about him that, up until January, 1912, I really believed the fellow was sincere and honest, and would carry out his scheme."

E. C. Kilbourne, referring to the letter which he wrote on May 27, 1911, to Glover, advising Glover, who desired to sell certain land to the appellees, to take up the matter with De Larm and Biehl, who had made some extensive purchases of lands, and saying, "They bought the Tobey Bros. ranch, and paid for same in bonds of the Columbia River Orchards Company," testified that he believed the bonds were good, "because we had practically completed the pumping plant then. Fox was about through with his ditch—well along with it—and it looked as though things were going to be all right." He testified that he thought the limit of the bond issue was $300,000, and that Mr. De Larm inspired perfect confidence. The appellants, notwithstanding their interest in the matter, did not discover, until the collapse of the scheme, about April 1, 1912, that they had been defrauded. They had far greater reason to inquire concerning the value of the bonds than had the appellees, for they took bonds in payment for their property, and after investigation, while the appellees were not to receive bonds, but money, in payment for their contract. The principal fraud practiced upon the appellants by De Larm was his inflation of the bond issue and his forgeries, and it is in evidence that the appellees were informed by De Larm, at the time when he made his contract with the appellants, that the bonds which he transferred to the appellants were a portion of the original issue of $300,-000. The evidence tends to show that the sum of $69,000 paid by the appellees for the property was in excess of its actual value.

The decree is affirmed.