ROBERT B. PARKER, Appellant, v. E. M. O'BRYEN, Administrator *ad litem* of the Estate of Rebecca Parker, deceased.

St. Louis Court of Appeals, March 3, 1914.

1. DOMESTIC RELATIONS: Action by Son Against Mother's Estate: Bills and Notes: Sufficiency of Consideration. A mother and two sons, owning three-fifths of a tract of land, purchased the outstanding interest of the other two heirs for $1,600, each contributing one-third of that amount, and each taking title to one-third of the interest so acquired. The mother, who was advanced in years and dominated by these two sons, executed to each of them a promissory note for $800, payable at her death. This arrangement was secretly consummated, and the two sons carefully concealed it from the other heirs and the world until one of them filed a claim against the

Parker v. O'Bryen.

mother's estate founded upon the note given to him. His only claim of consideration was, that he joined his mother and brother in the purchase at his mother's request, to prevent a partition of the land by the heirs whose interests were acquired. *Held*, under the evidence, that it was for the jury to determine whether the alleged consideration was not in fact a mere pretended consideration and a sham, particularly in view of the fact that the mother had homestead and dower rights in the property which would have allowed her to retain possession of it.

2. ———: ———: ———: Undue Influence. A mother and two sons, owning three-fifths of a tract of land, purchased the outstanding interest of the other two heirs for $1,600, each contributing one-third of that amount, and each taking title to one-third of the interest so acquired. The mother, who was advanced in years and dominated by these two sons, executed to each of them a promissory note for $800, payable at her death. This arrangement was secretly consummated, and the two sons carefully concealed it from the other heirs and the world until one of them filed a claim against the mother's estate founded upon the note given to him. *Held*, that considering the relationship and situation of the parties, the character of the transaction involved and the attendant circumstances, the burden of showing that absolute fairness characterized the transaction and that no advantage was taken of the mother rested upon claimant, and that whether this burden was successfully assumed by him was a question for the jury, under the evidence.

3. TRIAL PRACTICE: Demurrer to Evidence: Conflicting Evidence. Where the evidence is conflicting, the question should be submitted to the jury and not declared by the court as a matter of law.

4. BILLS AND NOTES: Consideration: Burden of Proof: Domestic Relations. The presumption that a promissory note imports a consideration is but prima facie and is overthrown by proof of a confidential relation between the parties and that the note was procured as part and parcel of a transaction highly advantageous to the payee; so that, where a note was given by an aged mother to her son who dominated her and who carefully concealed the transaction from the other heirs, and the transaction was highly advantageous to him, the burden rested upon him, in an action against the mother's estate founded on the note, to establish that no advantage was taken of the mother and that the note was supported by a valid consideration.

Appeal from Shelby Circuit Court.—*Hon. Nat M. Shelton*, Judge.

AFFIRMED.

*V. L. Drain* for appellant.

(1) The mere fact that the note is payable after the death of the maker does not affect its validity. The date of payment is fixed at a time which is bound to occur and this satisfies the law. Story on Bills, Sections 47, 50, 51; 4 Am. & Eng. Ency. of Law (2 Ed.), p. 92; Bank v. Skeen, 29 Mo. App. 115, 101 Mo. 683. (2) The note sued upon is a negotiable instrument, and it therefore imports a consideration. The law merchant clothes it with such a character. It is incumbent upon the party alleging a failure of consideration to sustain his allegation by proof, and failing in this, the holder is entitled to recover. R. S. 1909, Secs. 9995-9996; 4 Am. & Eng. Ency. of Law (2 Ed.), p. 186; Catterlin v. Lusk, 98 Mo. App. 182, 71 S. W. 1109; Locher v. Kuechenmeister, 120 Mo. App. 701. (3) The agreement to purchase the share of the dissatisfied heirs in the farm formerly owned by the husband of Rebecca Parker, and to allow it to remain intact, without partition, so that the widow could occupy it free from the annoyance of legal proceedings, was a good and sufficient consideration as a matter of law. Therefore the court was right in directing the jury to find for the plaintiff in the first instance, and the judgment afterward sustaining the motion for a new trial was erroneous. 4 Am. and Eng. Ency. of Law (2 Ed.), p. 188; Fitzgerald v. Fleming, 58 Mo. App. 185; Wood v. Flannery, 89 Mo. App. 632; Shieldly v. School Dist., 138 Mo. 672; Curry v. Harden, 109 Mo. App. 678; Patt v. Leavell, 161 Mo. App. 242; Robbins v. Robbins Estate, 158 S. W. 400.

*Humphrey & Gose* for respondent.

(1) Where one stands in an intimate personal and business relation with another who is in any sense

dependent upon him and deals with him in a matter of advantage to himself, such one is bound to affirmatively show that the consideration was adequate, that the whole transaction was fair and just and that no advantage was taken. Bogie v. Nolan, 96 Mo. 98; Hall v. Knappenberger, 97 Mo. 511; Martin v. Baker, 135 Mo. 495; McClure v. Lewis, 72 Mo. 322; Street v. Gass, 62 Mo. 228; Ennis v. Burnham, 159 Mo. 518; Kirschner v. Kirschner, 113 Mo. 297; Yosti v. Laughran, 49 Mo. 594; Cadwallader v. West, 48 Mo. 483; Gay v. Gillilan, 92 Mo. 263. (2) The right to recover in this case, was under the facts developed, a question for the jury under proper instructions from the court. Bogie v. Nolan, 96 Mo. 98; Hall v. Knappenberger, 97 Mo. 509. Even though the evidence of Louis Parker had not been contradicted in several material matters, the question concerning his testimony is still for the jury as under our law the matter of the credibility of the witness and the value to be accorded to his testimony are committed to that tribunal alone. Coffman v. Dyas, 159 S. W. 843. (3) Unless, in granting a new trial, the court exercised its discretion in an arbitrary and improvident manner, its action will not be disturbed on appeal. Railroad v. Radon, 207 Mo. 406; Schultz v. Railroad, 144 S. W. 124; Loftus v. Railroad, 220 Mo. 481. To grant a new trial in order to remedy that which at the time it had shocked the conscience of the court to do is certainly not an abuse of its discretionary power.

ALLEN, J.—This is an action, begun in the probate court of Shelby county, for the allowance of a demand in favor of appellant against the estate of his mother, Rebecca Parker, deceased, founded upon a promissory note. The probate court allowed said demand against the estate. Upon appeal to the circuit court, and a trial de novo there, before the court and a jury, the court, at the close of all the evidence in

the case, gave a peremptory instruction directing a
verdict for plaintiff, the appellant here; and in ac-
cordance with said instruction a verdict was duly
returned by the jury. Thereafter the court sustained
a motion for a new trial; from which order the plain-
tiff prosecutes this appeal.

The note sought to be allowed against said estate
is as follows:

"$800. June 24, 1902. At my death I promise to
pay to the order of Robert B. Parker $800 for value
received, negotiable and payable without defalcation or
discount, and with interest from maturity at the rate
of ——— per cent per annum, and if interest be not
paid annually to become as principal and bear the same
rate of interest.

Due at my death.            REBECCA PARKER."

It appears that the father of this plaintiff died
intestate in January, 1902, owning a tract of land in
Shelby county, consisting of one hundred and sixty
acres, upon which he lived with his family. He left
surviving him a widow, Rebecca Parker, and four
children, viz., Robert B. Parker (this plaintiff), Louis
F. Parker, Mrs. Maggie B. Elliott and Mrs. Mary
Broughton. The widow continued to reside at the old
home. At the father's death and thereafter, it appears
that all of the children resided elsewhere, except this
plaintiff, Robert. There is testimony to the effect that
he, at the time of the execution of the note in contro-
versy, was living in the house with his mother.

Shortly after the father's death, it appears that
an arrangement was entered into between the two sons
and their mother to purchase the interests of the two
daughters in the farm. This was finally agreed upon,
and their interests were purchased by the two sons
and the mother for $1600. It appears that the deed
was prepared in April, 1902, executed June 4, 1902,

and delivered on or about June 24, 1902; Mrs. Parker having, on or about the latter date, filed her election to take a child's share of her deceased husband's property. It was in connection with this transaction that the note for $800 here in question was executed to this plaintiff on June 24, 1902, at which time a like note, for the same amount, was executed by the mother to the other son, Louis.

What the transaction was between the mother and these two sons is to be gleaned largely from the testimony of Louis F. Parker, the only witness who testified below on behalf of the plaintiff, his testimony being received without objection. In brief, his version of the affair is to the effect that, after his father's death, his two sisters were insistent upon getting their interests out of the father's estate, and were threatening partition proceedings; that his mother was fearful lest she be disturbed in her use and enjoyment of the home place, and that she prevailed upon the witness and plaintiff to join her in purchasing the daughters' interests, to prevent a partition of the land. In any event, such purchase was made, the mother and the two sons each paying $533.33, a total of $1600.

In this transaction it seems that the sons first arranged with their mother for her to give them a deed to all of her interest in the land, to take effect presumably at her death, in order that they might ultimately acquire the entire property. This plan, however, was abandoned for the reason, as it seems, that it was thought better for the sons to take notes, payable at the mother's death, sufficient in amount to consume all of the latter's interest in the property.

It is quite clear that the daughters were kept in entire ignorance of the execution of these notes by the mother, and that they knew nothing of what took place between their brothers and their mother, except that their interests in the land had been purchased as aforesaid. It seems that one of the daughters, Mrs. Elliott,

has since died, her interest in the mother's estate passing to her children.

The mother, Rebecca Parker, died intestate on April 27, 1910, being then eighty-one years of age. Louis was appointed administrator of her estate. There was testimony, in defense, to the effect that before administration was begun upon Mrs. Parker's estate, and without divulging to the other heirs the existence of these notes, plaintiff and his brother, Louis, undertook to "settle" with the other heirs for something like seventy-five dollars; that failing in this, plaintiff declared that he and his brother intended "to get every cent" of their mother's estate, and that they had some notes which they would present.

Though Louis held a note identical with that filed by plaintiff, in the probate court, he, as administrator, represented the estate in the trial there had with respect to the allowance of his brother's demand, without employing counsel to defend on behalf of the estate. It further appears that this plaintiff, Robert Parker, owed his mother's estate $500 upon a note executed by him, but that no effort was made by Louis, as administrator, to offset this against his brother's claim.

After the trial in the probate court, upon the request of the heirs, who appealed from the judgment there rendered, the probate court appointed an administrator *ad litem,* one E. M. O'Bryen, to represent the estate thereafter in the litigation.

There is much evidence in the record relative to the profits derived by the sons from the farm, after they and their mother had purchased the daughters' interests therein, which it is unnecessary for us to relate in detail. From the evidence adduced, however, it would seem that the mother was merely allowed to remain and occupy the house, and that she, for some years at least, made her own living in large part, by raising chickens, selling eggs, butter, etc., and that

she was merely furnished with certain help and such necessities as she required. It seems that there were considerable profits derived from the farm, for which, so far as appears, no accounting was ever made. What the agreement between the sons and their mother was relative to her use of the place is not clear. Louis testified that there was no contract or agreement in the premises further than that his mother "was to have it as a home." When asked what he meant by that he said: "She was to have the house as hers to live there." He claimed that nothing was said as to who was to have the use of the land itself, saying: "We claimed the rent of it was consumed in taking care of her practically." The testimony as a whole, however, does not tend to bear out the latter statement; but the question of accounting for such profits is a matter not here directly involved.

The defense was that the note was executed by Mrs. Parker without consideration, and that it was procured from her by undue influence exercised over her by the sons in their own behalf. Plaintiff does not contend that the note here is valid as a mere gift by the mother to take effect at her death, but contends that it is supported by an ample consideration; that consideration being the joining of Robert and Louis with their mother, at her request, in the purchase of the interests of the two daughters, to prevent the partitioning of the land, as is claimed, and to enable the mother to have the place as a home during the remainder of her life. In this connection it may be said that Mrs. Broughton testified to the effect that she did not desire the land partitioned, nor want to get her interest therein, but that she sold her interest at her mother's request, and to satisfy the latter; and that partition proceedings were not threatened or contemplated.

Appellant also contends that no confidential relation was shown to exist between Mrs. Parker and her

sons, and that there is no evidence of any undue influence exerted by the latter in procuring the notes; and that the trial court erred in setting aside the verdict which had been rendered pursuant to the court's peremptory instruction.

But we think it altogether clear that the court committed no error in sustaining the motion for a new trial. Indeed, it appears beyond doubt that the evidence was such as to require the submission of the issues to the jury. It is true, as appellant says, that a promissory note imports a consideration. But this is a matter merely affecting the burden of proof. The transaction attending the execution of these notes was a most remarkable one, to say the least. The effect of it was that Mrs. Parker and the sons each paid $533.33 for the purchase of the two-fifths interest of the daughters in the land—Mrs. Parker filing her election to take a child's share. Coincident with the final consummation of this transaction, Mrs. Parker gives to each of the sons a note for $800, payable at her death. By the transaction, therefore, this plaintiff, for the payment of $533.33, acquired a one-third interest in the two-fifths interest of his sisters in the land —which in itself is said to have been a good bargain— and also a note for $800 from his mother. It is not contended that there was any consideration for the note except that plaintiff joined his mother and brother in this transaction, at her request, as is claimed, to prevent a partition of the land by plaintiff's sisters. It is denied that plaintiff and his brother were seeking to have the land partitioned, but on the contrary the sole contention is that the fear which the mother is said to have entertained on this score was brought about by the attitude of her daughters. And as we have said, there was evidence going to deny the latter.

At the time in question Mrs. Parker had her dower and homestead rights in the land, of which no one could deprive her, without her consent. Whether she

was ever advised of or had any knowledge of this does not appear. And it was for the jury to say whether, under all the evidence, the alleged consideration for the notes was not in fact a mere pretended consideration and a sham, particularly in view of the fact that, though Mrs. Parker had her homestead and dower rights, the agreement respecting her use of the property, it is said, merely purported to give her "the right to have the house as hers to live there."

As to the defense of undue influence, we think it altogether clear that this too was a question for the jury. The evidence shows that this plaintiff and his brother secretly transacted this matter with their mother, who was then quite advanced in years. That she was entirely in the hands of her sons in the matter, is to be inferred from all the facts and circumstances in evidence. Her daughters were away from the home, and the entire matter was apparently concealed from them, not only at the time but during the entire eight years intervening before the mother's death. There is some dispute as to whether this plaintiff was living with his mother upon the farm at the time the notes were executed. Louis, in testifying, said that his mother "never made her home" with either him or plaintiff. However, elsewhere in his testimony, he stated that at the time of the execution of the notes his mother was living with Robert, this plaintiff. At any rate the evidence adduced relative to the situation of the parties, the character of the transaction involved, and the attendant circumstances, was such as to cast upon plaintiff the burden of showing that absolute fairness characterized the transaction, and that no advantage was taken of his aged mother.

Touching this question it is said in Street v. Gass, 62 Mo. l. c. 228: "The rule on this point is of universal recognition and finds application commensurate with the existence of confidential relations. It is, however, chiefly invoked between parent and child,

client and attorney, principal and agent, and patient and medical adviser; though as before stated, it is by no means confined within such narrow limits. There exists, therefore, no necessity to show fraud or imposition practiced on him who bestows the confidence; but simply to show that, during the pendency of such intimate relations, the conveyance in question was made. This being done, all the above mentioned consequences as to the onus of proof attend the given transaction as inevitable incidents." [See, also, Gay v. Gillilan, 92 Mo. 250, 5 S. W. 7; Bogie v. Nolan, 96 Mo. 85, 9 S. W. 14; Hall v. Knappenberger, 97 Mo. 509, 11 S. W. 239; Kincer v. Kincer, 246 Mo. l. c. 437, 151 S. W. 424.]

Many other authorities might be referred to in this connection, but to do so would here serve no useful purpose. The only question now before us is whether the action of the lower court in granting a new trial should be sustained. No extended discussion of the questions inhering in the case is necessary for a determination of that which alone is now here for decision. That there are questions of fact to be passed upon by a jury we think is beyond dispute, and hence the trial court was clearly right in granting a new trial.

We may say, however, that under the circumstances shown in evidence respecting the relations between plaintiff and his aged mother, and the nature of the transaction itself and the circumstances attending it, we think that the burden was upon the plaintiff to show that this note was founded upon a valid consideration, that no advantage was taken of his mother, and that the note was not the product of undue influence or any species of imposition. The presumption afforded by the note is but prima facie, and is overthrown by proof of a confidential relation and the procurement of the note as a part and parcel of a transaction highly advantageous to the plaintiff.

The record before us is, in fact, such as, upon its face, to suggest unfair dealing on the part of plaintiff and his brother in and about the transaction here involved. The latter was one highly advantageous to them. And the fact that after their father's death they secretly consummated it with their mother, when she evidently had no one but them to look to for counsel and advice, and that apparently they carefully concealed it from the other heirs and the world, until it was necessary to make disclosure thereof in order to consume their mother's estate, after a futile attempt to settle with the other heirs, suggests the presence of that which would not bear the light of day. It may be reasonably inferred that a transaction fair upon its face, and in which no advantage was taken of the mother, would not have been shrouded in mystery and darkness as was this.

The action of the circuit court in granting a new trial is affirmed. *Reynolds, P. J.,* and *Nortoni, J.,* concur.