PEARL KINCER, Appellant, v. JOHN KINCER et al.

Division Two, December 10, 1912.

1. **UNDUE INFLUENCE: Deeding Property to Son: Sanity of Grantor.** A man ninety-one years old, nearly blind, almost deaf, and a bedridden invalid for about four years, deeded all his property, worth about seventy dollars a month in rentals, to one of his sons for an 'alleged consideration of ten dollars, making no conditions or reservations. After the execution of the deeds there was an inquiry into the grantor's sanity in the probate court, wherein he told the jury that he gave the property to the son because that son had taken care of him for years and had promised to do so as long as he lived.' The jury found him sane. *Held,* in this suit to set aside the deeds, that the grantor was sane when the deeds were made.

2. ———: ———: **Fiduciary Relation: Burden of Proof.** Where an old man was, owing to his extreme age and afflictions, a prisoner in his own house, while a son had full dominion over his body and over the management of his property and its income, the law presumes that deeds granting, without reservation or condition, all of the old man's real estate to the son were the result of undue influence exerted by the son, and the burden of removing that presumption rests upon the son in a suit by another heir to set aside the deeds.

3. ———: ———: ———: **Evidence.** Martin Kincer was over ninety years old, nearly blind, almost deaf, and had been a bedridden invalid for about four years, when he deeded all his real estate, worth about seventy dollars a month in rentals, to his son John for the alleged consideration of ten dollars. John was then about fifty years old and the evidence shows that, aside from what he gained by doing odd jobs, he had been supported by his father all of his life. He had had control of his father's

property before the transfer and had collected the rents. He had always lived in his father's home, and at the time of the transfer he and his wife were caring for the father, who was confined to his bed. Some advancements had been made to three of Martin Kincer's children, but none were made after about the time when John took charge of his affairs, and there was no evidence of ill will upon Martin's part toward any of the children, except toward the family of his son William. John made contradictory and inconsistent statements as to his father's reasons for deeding him the property. *Held*, in a suit by William's daughter to set aside the deeds, that they were the result of undue influence.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale*, Judge.

REVERSED AND REMANDED (*with directions*).

*McShane & Goodwin* for appellant.

(1) Gifts, grants or donations, obtained by attorney from client, adviser from advisee, trustee from *cestui que trust*, parent from child, and guardian from ward are watched by courts with the most scrutinizing jealousy and generally held to be presumptively void. Garvin v. Williams, 44 Mo. 465. (2) Where one who stands in the relation of confidence to a grantor or testator who is old and *in extremis* prepares a will or conveyance in his favor, the law regards the transaction with great suspicion, and the clearest evidence is required that there was no fraud, influence or mistake. The presumption is against the propriety of the transaction; and the *onus* of establishing the devise or gift to have been voluntary and well understood rests upon the party claiming; and this in addition to the evidence to be derived from the execution of the will or conveyances devising or transferring the property. Harvey v. Sullins, 46 Mo. 147. (3) Where one stands in a relation of trust and confidence with another who is old and failing in mind, the law will presume a contract or conveyance between them to the

detriment of the trusting one to have been the result of undue influence emanating from the stronger party. Cadwallader v. West, 48 Mo. 483. (4) In transactions connected with the transfer of property the nonintervention of a disinterested third party or independent professional adviser, especially when the donor is, from age or weakness of disposition, likely to be imposed upon, the statement of a consideration where there was none, or improvidence in the transactions, are circumstances which furnished a probable, though not always certain, test of undue influence or fraud. Cadwallader v. West, 48 Mo. 483; Street v. Goss, 62 Mo. 226; McClure v. Lewis, 72 Mo. 314; Hall v. Knappenberger, 97 Mo. 509; Lins v. Lenhardt, 127 Mo. 271; Martin v. Baker, 135 Mo. 495. (5) Any influence however exercised, which destroys free agency and substitutes the will of another for that other person in whose name the act brought in judgment is done, is undue and wrongful. Dingman v. Romine, 141 Mo. 466. (6) As bearing on the question of undue influence the relationship of the parties to each other, the mental condition of the person imposed upon and the character of the transaction should be taken into consideration. Dingman v. Romine, 141 Mo. 466. Yosti v. Laughran, 49 Mo. 594. (7) True it is that this court has held that the mere influence of natural affection (the affection of parent for a child) is under no ban known to the law; that in such instance there must be present an active exercise of influence, overpersuasion, coercion or force, fraud or deception, breaking the will power of the testator. Norton v. Paxton, 110 Mo. 456; Teckenbrock v. McLaughlin, 209 Mo. 533; McKissock v. Groom, 148 Mo. 459; McFadin v. Catron, 120 Mo. 252. But in all of the above cases and wherever the above principle has been announced, it has been conceded by every court announcing such a doctrine that if the influence which is charged to have been exerted and the circumstances under which

it was exercised were of such a character as to destroy the donor's free agency and substitute therefor the will and agency of another person, or if there was present an active exercise of coercion or force, fraud or deception, breaking and controlling the will of the testator or donor, then a conveyance in such instance is void.

*Julius T. Muench* for respondents.

(1)   The situation, as shown by the evidence in this case, was not such as to throw upon John Kincer. the burden of proving that the execution of the two deeds of December 7, 1906, had not been procured by the exercise of undue influence upon his part, for the reasons:  (a)  That the mere fact that the relation of parent and child existed between him and his father, Martin Kincer, the grantor in the deeds, raised no such presumption.  29 Am. & Eng. Ency. Law, p. 132: Fitzpatrick v. Weber, 168 Mo. 562; McKissock v. Groom, 148 Mo. 467; McFadin v. Catron, 120 Mo. 252; Maddox v. Maddox, 114 Mo. 48; McLeod v. McLeod, 40 So. (Ala.) 414; Friend's Estate, 198 Pa. St. 363; Teter v. Teter, 53 S. E. (W. Va.) 779; Estate of Flagg, 27 N. Y. Misc. 401; Furlong v. Carraher, 108 Iowa, 492; Hook's Estate, 207 Pa. St. 203; Ball v. Ball, 214 Ill. 255; Bonsal v. Randall, 192 Mo. 525; Hamilton v. Armstrong, 120 Mo. 597; Kennedy v. Bates, 142 Mo. 51; Gibony v. Foster, 230 Mo. 106.  (b)  That the fact that he was favored, to the exclusion of other children of the grantor, raises no such presumption. Carter v. Dilley, 167 Mo. 546; Hughes v. Rader, 183 Mo. 709; Weston v. Hanson, 212 Mo. 269; Berberet v. Berberet, 131 Mo. 410; 29 Am. & Eng. Ency. Law, p. 133. (2) Even though it be conceded, for the sake of argument, that the burden of disproving undue influence rested upon John Kincer, he has more than met that requirement, according to the standards estab-

lished by various cases in this State. Teckenbrock v. McLaughlin, 209 Mo. 533; Sawyer v. White, 122 Fed. 223. (3) An influence which arises out of kindness, attachment or affection, or gratitude for past services, is not considered undue. 29 Am. & Eng. Ency. Law, p. 106; Norton v. Paxton, 110 Mo. 456; Cases under point 1. (4) Attacks made by heirs upon deeds from parents to favored children should be discouraged. Kennedy v. Bates, 142 Fed. 51; Beyer v. Lefevre, 186 U. S. 125. (5) Where the evidence is conflicting, an appellate court should defer to the judgment of the trial judge, who possesses the distinct advantage of receiving impressions and gauging the veracity of witnesses, from observing the demeanor of such witnesses on the stand, and their manner of testifying. Lins v. Lenhardt, 127 Mo. 281; Walker v. Dobbins, 152 Mo. App. 270; Jones v. Thomas, 218 Mo. 540; Huffman v. Huffman, 217 Mo. 182; Brecker v. Fillingham, 209 Mo. 583; Tinker v. Kier, 195 Mo. 183.

ROY, C.—Martin Kincer, on December 7, 1906, made two quitclaim deeds for two different tracts of real estate in the city of St. Louis to his son, John Kincer. The father died January 13, 1908, and the plaintiff, his granddaughter, sued to set aside those deeds on the ground of undue influence. From a decree dismissing her bill she has appealed.

Martin Kincer was ninety-three years of age when he died. He had been blind in one eye since early life, and the vision of the other eye had gradually faded until he was nearly blind. He was so deaf that it was necessary to get close to him and shout almost in his ear to make him hear. In January, 1903, he fell and broke his hip and was thereafter confined to his bed until his death. It was necessary for him to take "'physic,'" as a result of which his bed was sometimes made unclean.

After the execution of the deeds in question, and in August, 1907, there was an inquiry in the probate court as to his sanity. The jury went to his house and asked him his reasons for making the deeds to John. He answered that he had done so because John had taken care of him for a number of years and had promised to take care of him as long as he lived. The jury unanimously found that he was of sound mind. The deeds were ordinary quitclaim deeds, expressed to be made in consideration of one dollar, and without any reservations or conditions. He had lived for many years in north St. Louis, and had been engaged in the wood business, and at one time had a grocery store. He had been out of business for thirty years. At the time of his retirement he owned a double brick building at 2810 Broadway, in part of which he lived and rented the other to a tenant. He also owned property on Ninth street on which were three tenements, all rented for residences. Whether they were in separate buildings or all in one building does not clearly appear from the evidence. Up to the time of his death the rents on that part of the property not occupied by himself and his son John were about seventy dollars a month, running back for many years. His wife had died about 1888. His eldest son, Abner, sixty-four years of age at the time of the trial, was married at twenty-one and went to himself, his father furnishing him $500 to go into the grocery business, which was soon sold, and the money was repaid. Abner separated from his wife, who lived in one of his father's houses, paying rent with reasonable promptness.

Abner's son, Arthur, testified that soon after his grandfather was hurt, his aunt Amelia, the wife of his Uncle John, came to his mother's house, who was confined in bed, just recovering from an operation, and notified his mother that she would have to pay more rent or move. They had been paying twelve dollars

and it was raised to fourteen dollars. There was no evidence of ill will between Abner and his father.

Martin, Jr., another son, married in 1882 and was on a farm for five years, then came back to St. Louis. He seems never to have prospered. He was assisted in various ways by his father to the extent of about $2500. He died in 1900, leaving a widow and six or seven children, three of whom are minors. There is no showing in the evidence that there was other than kind feelings between his family and his father.

Sarah, a daughter, married young and died, leaving one son, Martin Cranford. Neither he nor his mother ever had any advancements, and there is no showing of ill will between Martin Kincer, Sr., and them.

Mary, another daughter, was twice married, and subsequently lived with another man under questionable relations. She at various times received assistance from the father not amounting in all to more than $100. She testified in behalf of the defendant and stated that about 1895 her father told her that he had given the three oldest brothers all he ever intended to give them and that he wasn't going to give her anything because she did not behave herself. In her evidence the following occurred:

"Q. Do you know whether or not he made any advancements or had given anything to your other brothers? A. Yes, sir; I have heard him say so time and again, and I know of him advancing money to my brother Marty.

"Q. Do you know of his advancing money to any of your other brothers? A. No, sir; only what he said himself."

William, the third son, married early in life and went to himself, always living in close vicinity to his father. About 1882 he built a house next door to his father and lived there until his death in 1900. About the time of John's marriage, the sister Mary came

home to her father's, and the father wanted the use of Will's buggy to bring up Mary's trunk, and it was refused.   The father built a spite fence between him and William, and William's children put up a flag by the fence with the word "Rats" on it.   In a few years the fence was taken down.   There was more or less intermittent visiting beteen William's family and his father.   There were never any advancements made to William or his family.   He left a widow and four children, of whom the plaintiff is one.   They are all self-sustaining, but earn their living by work, one of them being a member of the police force.

John, the youngest son, and the principal defendant herein, was fifty-one years old at the time of the trial.   He lived in his father's home all his life.   He was married about 1890.   He has had five children, of whom three are living.   Immediately after John's marriage his father gave him all the household goods, and John testified that after that time his father never had any personal property.   There was evidence tending strongly to prove that John was never in any business prior to the making of the deeds except to do the repair work for his father and occasionally odd jobs for neighbors.

In the proceeding in the probate court concerning the sanity of his father, John's deposition was taken and it was read on the trial by the plaintiff.   In that deposition he said, speaking of his father:

"Q.   When did he own any personal property? A.   He did before I was married.

"Q.   And you are positive that within the last ten years he has not owned a bit of personal property?   A. Not a penny.

"Q.   Nothing at all?   Did he have any horses or wagons, or anything of that nature?   A.   No, sir.

"Q.   Have you been engaged in business ever since you were married?   A.   No, sir.

"Q. Have you been engaged in business for the last ten years? A. No, sir.

"Q. And since you were married you say he has had no personal property? A. No, sir; not since the day after I was married.

"Q. Since that time he has had no personal property at all? A. No, sir.

"Q. From the very first day you were married, he has owned no personal property at all? A. The second day he didn't; the first day we didn't get settled down.

"Q. When you were married, where did you settle down? A. Right there in the house.

"Q. 2810 North Broadway? A. Yes, sir.

"Q. On the second day after you were married, what did he give you? A. The household goods; household property.

"Q. What did he ever do with the real estate that he owned? A. What did he ever do with it?

"Q. Yes. A. I bought it down here on the 7th day of December, 1906.

"Q. You bought it from your father? A. Yes, sir.

"Q. What did you give him for it? A. Ten dollars.

"Q. Did you give him the actual money? A. Yes, I gave it to him, and he turned around and gave it to the little boy; said he didn't have any use for it.

"Q. What little boy? A. My son."

And also in regard to the real estate and his own employment he said:

"Q. How did he happen to transfer to you? A. Because he said he couldn't be bothered with people running to him, and he wanted me to take it and do just as I pleased with it; sell it or keep it, just as I pleased. He wanted me to sell at once, but I told him I wouldn't; that I would keep it as long as he lived.

Kincer v. Kincer.

"Q. And you never asked him to turn it over to you? A. No, sir; he had often said he wanted me to take the property; that he wanted me to have it, and he couldn't be bothered with it.

"Q. When did he say that? A. Since he was in bed; anyway, since he got hurt and before that. I kept telling him no.

"Q. Up until December, 1906, this property has been bringing in a rental of about seventy dollars a month, hasn't it? A. Some where around there, that is if we got it all.

"Q. That is, it averaged around there? A. Yes.

"Q. That would be about seven or eight hundred dollars a year? A. Yes.

"Q. And that has been going on for the last ten years? A. Yes.

"Q. What became of all that money? A. Used it for repairs—for streets, all sorts of things; all work necessary to be done around—lumber, bricks, anything needed for repairs for the streets.

"Q. Do you mean to convey the idea that all the money taken in in rent has been used in repairing the buildings and in fixing up the streets? A. Not all of it; most all of it.

"Q. None of that money has been used to support the old gentleman? A. None to amount to anything, only once in a while we have some spare money and buy him something with it—sometimes get him some underclothes, such as that.

"Q. None of that money has been used to maintain your family? Your own household? A. It might be a little; not much of it; very little.

"Q. You have collected that money yourself? A. Yes, sir.

"Q. For your father up to the time of this transfer? A. Yes, sir.

"Q. Have you kept any record of what you took in? A. No, sir.

"Q. How long have you been in the business? Have you been in business during all of the last ten years? A. I have been working around at building, patching up—odd jobs and so on.

"Q. What do you mean by that? A. Carpenter work.

"Q. How long have you been in the saloon business? You say you are in the saloon business now? A. Yes, sir; going on six months.

"Q. Prior to that time you were in the carpenter business? A. Yes, sir.

"Q. You have followed the carpenter business, with the exception of the last six months, for the last ten years? A. No, no. Not for the last ten years.

"Q. How long have you followed the carpenter business? A. About two years.

"Q. Prior to that time what did you do? A. Patched around for the neighbors, and did my own work; patching up around on the property where it needed it.

"Q. How long did you work around that way? A. About twenty years, I guess; maybe twenty-five years.

"Q. In that way, how much did you make a month? A. A month?

"Q. Yes. A. I can't tell about that; when I worked at carpenter work I got twenty-three dollars a week, when I worked steady.

"Q. Working for yourself? A. Not working around; when I worked steady.

"Q. I don't mean when your were working steady. You say for about ten years you were working around at patching for yourself? A. For the old man.

"Q. For your father? A. Yes, sir.

"Q. How long did that last? A. Up until the day I got it for myself.

"Q. And since you have been engaged in the saloon business also? A. No, sir.

"Q. Then, the only real income you ever did make was at carpenter work? A. Yes.

"Q. And that's about three years ago? A. Yes.

"Q. You worked how long at the carpenter business steady? A. About a year, I guess, off and on.

"Q. How much did you make a week? A. About twenty-three dollars a week; I worked off and on for a year; I guess I made about eight months out of it all.

"Q. So for eight months that you worked as a carpenter you got twenty-three dollars a week? A. Yes, sir.

"Q. And you have now been in the saloon business about six months. A. Yes.

"Q. Have you made a large amount of money in the saloon business? A. No; I don't even make good wages out of it.

"Q. There is not much doing, then, in the saloon business? A. No; there's not much doing in the saloon business.

"Q. When you were married what did you have, outside of what your father gave you? A. I didn't have anything except my clothes and some few little things.

"Q. And ten years ago, what property did you have. A. Nothing more than I had before.

"Q. Did your wife when you were married have any money? A. No, sir.

"Q. And as a matter of fact, with the exception of the eight months that you worked as a carpenter, you have really lived out of your father's rents, have you not? A. No, sir.

"Q. How did you live, then, if you didn't live out of the money received from the rents? A. I used my own money for food bills and such things as that.

"Q. It appears from your statement that for almost nine years you worked for your father? A. I worked for him as long as he was able to be around and take care of his business.

"Q. Where did you get the money to live on? A. Where did I get it?

"Q. Yes? A. Well, I got along with what little I made working around, and what little he gave me.

"Q. That's the point I want to bring out, that as a matter of fact you and your wife have lived off the income of the property? A. No, we didn't; I made money working around; patching and so on.

"Q. So you don't mean to convey that you have not made any money for the last nine years? A. I made money working around for the neighbors and other people, patching up and fixing up things for them.

"Q. How much money a week or month did you make working around in this way? A. I can't tell you; I don't know exactly; all I know is I done the old man's work and my own work and I worked for the neighbors, patching up and fixing up for them at odd times, whenever I had anything to do.

"Q. Estimate in your own way how much you made a week. A. About eight or ten dollars; sometimes six dollars; sometimes as much as twenty dollars; I can't tell you just how much I did make.

"Q. How large a family have you? A. I have three children.

"Q. How old is the oldest child? A. Going on nineteen—no, going on eighteen.

"Q. How young is the youngest one? A. Eleven years old.

"Q. Have you dead children too? A. Yes, sir.

"Q. How many? A. Two.

"Q. You have had five children, altogether? A. Yes, sir.

"Q. Now, for the past ten years your father's estate has been under your management and control? A. Yes, sir.

"Q. And during this period of time you have had charge of everything? A. Yes, sir.

"Q. Now, for the past five years he has not been out of the house, directing and taking care of anything? A. No, sir."

Yet, after testifying as above in the deposition, he testified on the trial as follows:

"Q. You were questioned in your deposition regarding your employment during your entire life. Did you ever work? A. Yes, sir.

"Q. What occupation? A. Railroading, carpentering and machinist.

"Q. What railroad did you work for? A. St. Louis, Kansas City & Northern, now the Wabash.

"Q. How long did you work for them? A. Pretty nearly thirteen or fourteen years."

In his deposition, the defendant stated that his father gave to the notary, Mr. Hauschulte, at the time the deeds were acknowledged, his reasons for making the deeds, as follows:

"Q. Did Mr. Hauschulte come down to the house? A. He came down to the house, yes.

"Q. And he saw your father attach his mark to this deed? A. Yes, sir.

"Q. And it was after that that you gave him the ten dollars? A. I gave him the ten dollars while Hauschulte was having the deeds made out. I told Mr. Hauschulte to come down to the house; that the old man wanted to see him. When he come there at the house the old man told him that he wanted me to have the property; that he wasn't able to handle the business; people running there to rent it or to buy it, and he couldn't handle it and didn't want to be bothered with it; he said he wanted me to have it and do as I

pleased with it, and told Mr. Hauschulte to make out the deeds.

"Q. So Mr. Hauschulte went to make out the deeds? A. Yes.

"Q. But while he was making out the deeds you gave the ten dollars to you father? A. Yes, sir.

"Q. And then he gave it to the 'little boy? A. Yes, sir.

"Q. And then Mr. Hauschulte brought down the deeds? A. No, he sent for me—he sent for me and I went to his office and he said he would have the deeds there in a couple of days. And when he fetched them there, the old man signed them."

During the examination of Mr. Hauschulte the following occurred: "The Court: He didn't say anything concerning the reason why he was transferring all of this property to John? A. No, sir." ·

While not asked especially about it, Mr. Hauschulte's evidence clearly showed that he drew the deeds at John Kincer's direction, and that he did not see John's father about it until the deeds were acknowledged.

In his testimony at the trial, in regard to his father's reasons for making the deeds, John Kincer said:

"Q. What did your father say to you about that? A. He said to me 'John, about the will: we had better make a deed and be sure that the will don't get destroyed, for them people next next door,' he said, 'are mean enough to do anything.' That is exactly what he said. 'They are dirty enough to do anything,' he said. 'Them people will do anything to make away with that will, and the best thing we can do is to call Hauschulte and let him make a deed so they won't bother you.'

"Q. What did you say? A. I said I thought the will was just as good as the deed and he said they

might make away with it and it get destroyed and he said, 'You tell Mr. Hauschulte to come up in the morning and I will make out a deed,' and I went next morning and told Mr. Hauschulte.''

The first will was made about 1895, and the second on September 25, 1903. Mr. Hauschulte wrote them both. He could not state what the contents of the first will were. He stated that it was destroyed when the last was written, and the last one was left in his charge until the death of the testator. Mr. Maune, who witnessed both wills, testified that their contents were the same.

It was conceded at the trial that Martin Kincer, Sr., kept a book in which he set down the amounts furnished his children by him. That book shows about $2500 furnished Martin, Jr., most of which was before 1886. After that the amounts furnished him gradually diminished until they ceased in 1898, and the book did not show anything furnished any of the children after that year. That book did not show that any of the children except Martin, Jr., and Mary had received anything.

John and his wife had charge of the father and personally cared for him until his death and they were kind and attentive to him.

I. We have no difficulty in finding that Martin Kincer was sane when the deeds were made. But that is all that can be said in support of the deeds in controversy. Owing to his old age and afflictions he was a prisoner in his own house. He was kindly treated, but John had full dominion over his body and over the management of his property and its income.

The law raises a presumption that the deeds were the result of his undue influence over his father, and calls upon him to explain that they were not the result of such undue influence. In the absence of such explanation, the presumption becomes absolute. The

defendant has utterly failed to make a satisfactory explanation.

The claim is made that the other children were a burden to their father and that John was the only one who was a comfort to him. None of the other children was very successful in life. Martin was almost constantly in need of assistance, and got more or less of it down to about 1898. Mary had received about $100. Abner, Sarah and William were under no pecuniary obligation to their father in the way of advancements. All the other children had, early in life, passed out of the home nest. John alone remained at home. There is no escaping the conclusion from the evidence that his father financially supported him all his life, that support being supplemented to a very limited extent by John's income from odd jobs. That is clearly shown by his own evidence. In comparison with what he received, even Martin, Jr., got very little. The storms beat heavily upon the heads of his brothers and sisters, but John was always safely sheltered "in his father's house."

From a financial standpoint there was no cause for such conveyances. The income of the property was more than sufficient to pay for his support and care, even after his affliction.

In Martin v. Baker, 135 Mo. l. c. 504, property was transferred to a child in consideration of support. The income of the property was sufficient for that purpose. The court said: "That the contract thus secured was most unreasonable and unfair cannot be doubted. From the character of the contract, the relationship of the parties, and the mental condition of the grantor considered alone we would be bound to draw the inference that improper influences were brought to bear in securing the deed."

In that case there was a provision for a forfeiture in case of a failure to support the grantor. Not so here. No rights were reserved. John could have sold

the property at once; and then, with one reckless investment of the proceeds, all might have been over and the grantor a pauper. In the making of those deeds only John was cared for. The father and his other children were ignored.

It is claimed that the deeds were made because of coolness between the grantor and the family of his son William and because of the bad conduct of Mary. The coolness that existed twenty years before was caused by the fact that the father did not think that William was at that time kind enough to Mary. He surely did not disinherit Mary on account of her misbehavior, and also disinherit William's family because William was not kind to Mary. In any event that furnishes no reason why he should repudiate his other children.

John acquired the entire management of his father's property about ten years before the latter's death, and it was just about that time that the father ceased to aid any of his children. The book of advancements shows that fact. His father was not then crippled, and needed no special care, yet his income was all appropriated by John, he, of course, paying the necessary expenses. At that time there was a will, which was written about 1895. We presume that it was different from the will of 1903, because it is not reasonable to presume that it would be destroyed and replaced by a duplicate of it. After being injured in January, 1903, he made a will in September of that year, giving everything to John, and then followed the making of the deeds in 1906. The defendant gave several different explanations as to why those deeds were made. In his deposition he stated that his father made the deeds to him because he did not want to be bothered with it. On the trial he stated that the reason his father gave for making the deeds was because the people next door were mean enough to do anything and that they might make away with the

will. That is a very different reason from the other, and moreover it is irrational. The will was in the keeping of Mr. Hauschulte, and there was no reason to suppose that William's family could get control of it.

The law does justify a parent in favoring one child over another in the gift of property. It per- mits him to obey the dictates of his affections in that matter; and such parental affection is no mark of un- due influence. Those are rules regarded with great care by this court, but they stand side by side with the presumption above spoken of. If the parent is free, he may prefer one child over another of equal merit, giving no reason therefor. But whenever one of his children has the care and management of his property, any preference given to such child during such rela- tion must be shown to be of the utmost fairness. [Street v. Goss, 62 Mo. l. c. 229.] In that case it was said: "There exists therefore no necessity to show fraud or imposition practiced on him who bestows the confidence; but simply to show that, during the pen- dency of such intimate relations, the conveyance in question was made."

In Hall v. Knappenberger, 97 Mo. l. c. 511, it was said: "If, in such circumstances, a gift of any con- siderable value be bestowed by the one who reposes confidence upon the one in whom confidence is re- posed, such gift is presumptively void. The burden is cast upon the recipient of the gift; and it belongs to him to show the absolute fairness and validity of the gift and that it is entirely free from the taint of undue influence." In this case, in addition to being his father's agent, John was his nurse.

It was held in Dingman v. Romine, 141 Mo. l. c. 475, that there is no relation between men more calcu- lated to make the will of one subservient to that of the other than the relation of patient and nurse. That re- lation existed between John and his father in addition to the fiduciary relation.

We cannot do otherwise than stamp with our disapproval the transaction here involved, and we reverse the decree and remand the cause with directions to enter a decree in favor of the plaintiff. *Blair, C.,* concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.