EBENEZER BLACKISTON, WILLIAM P. BLACKISTON, FRANK H. BLACKISTON, CHARLES A. BLACKISTON, MARY ANNA UPSON, BELLE L. ELLISON, EBENEZER ELLSWORTH and SUSAN J. KACKLEY, Appellants, v. EDWARD FLINT RUSSELL and IONIA B. RUSSELL.—44 S. W. (2d) 22.

Division One, November 20, 1931.

*Culver, Phillip & Voorhees* and *Miles Elliott* for appellants.

*Randolph & Randolph* for respondents.

HYDE, C.—This is an action in equity to set aside a deed, to real estate in the city of St. Joseph, made by Rebecca S. Fleming to respondent Edward Flint Russell. Mrs. Fleming, a widow, died December 14, 1926, in St. Joseph, Missouri, at the age of 82 years. In 1925 she owned a residence at 1922 Clay Street, which had belonged to her deceased husband, and another tract of approximately 25 acres, which had been the home of her father, Captain Blackiston. Mrs. Fleming had no children. She had a sister, respondent Ionia B. Russell, who lived at Lawrence, Kansas. Mrs. Russell was made a defendant because she would not join as plaintiff. Mrs. Fleming was very fond of this sister and her children and visited in Lawrence frequently. Mrs. Russell also visited Mrs. Fleming frequently in St. Joseph. Mrs. Russell had four children, respondent Edward Russell, of Kansas City, Percy Russell, Memphis, Tennessee, Mrs. Rudier, of Lawrence, Kansas, and Mrs. Steward, of Phoenix, Arizona. The Russell children frequently visted Mrs. Fleming in St. Joseph and it was her custom to spend every other winter with Mrs. Steward in Phoenix. Mrs. Fleming had a deceased sister, Mrs. Anna Ellsworth, who had two children, appellants Belle Ellison and Ebenezer Ellsworth, who were not residents of Missouri and whom Mrs. Flem-

1168

ing seldom saw. Mrs. Fleming also had a deceased brother, Frank Blackiston. His six children are the other appellants. One of them, Mrs. Susan Kackley, had lived in St. Joseph for some time. About 1925 she and her husband moved into the house on Mrs. Fleming's 25-acre farm. Mrs. Kackley's mother lived there with her, as did Mary Anna Upson, Mrs. Kackley's sister.

During 1925 the Blackiston family seems to have gathered in St. Joseph. Ebenezer Blackiston had lived there since 1921. It is not in evidence where Mrs. Upson lived prior to 1925, but she said beginning with the fall of 1925 she saw Mrs. Fleming often. Charles Blackiston came to St. Joseph in December, 1925. He first went to Mrs. Kackley's and later he and his wife moved in with Mrs. Fleming. Percy (William P.) Blackiston also came, in 1925, to St. Joseph, from Oklahoma. The record is silent as to the whereabouts of Frank H. Blackiston. Mrs. Kackley and her husband took much interest in Mrs. Fleming and her property. The Moila Temple Association of St. Joseph owned a golf course, adjoining Mrs. Fleming's 25-acre tract, where the Kackleys lived. Mr. Kackley tried to sell it to the Association for an addition to its golf course. He got Mrs. Fleming to sign a letter offering it to the Association for $25,000. There were also real estate men working on the same deal for Mrs. Fleming, and there was evidence that she valued it as high as $40,000. However, the $25,000 offer was not accepted and the deal was dropped.

In August, 1925, Mrs. Fleming conveyed ten acres of this farm, including the residence, to Mrs. Kackley, for an agreed price of $7,000, of which Mrs. Kackley paid $500. The deed was immediately recorded by Mrs. Kackley, but nothing was done by her to pay or secure the balance of the purchase price. The matter remained in this condition for about three months. In October, 1925, Mrs. Fleming became ill and was taken by Mrs. Kackley to the Blackiston place. The doctor who treated her said that it was some digestive trouble. He also said that she had a general weakness and arteriosclerosis. She recovered in about two weeks and went to her sister's at Lawrence. While she was there her nephew, Percy Russell, came from Memphis to visit his mother.

Mrs. Fleming was worried about the failure of Mrs. Kackley to do anything about the balance of the purchase price of the ten acres, and regretted making the conveyance to her. Percy Russell returned with Mrs. Fleming to St. Joseph about the middle of November and went with her to Mr. J. W. Mytton, her next-door neighbor, who was her attorney, and had been her deceased husband's attorney. Mr. Mytton saw Mrs. Kackley, but she refused to do anything about the balance due. Whereupon, on November 18th, Mr. Mytton commenced suit for her against Mrs. Kackley to set aside the deed.

On the same day Mrs. Fleming made a will which Mr. Mytton prepared. By this will she left her property principally to the members of the Russell family, although she made bequests of from $100 to $3,000 to some of her other nieces and nephews. Some of the Blackistons were not mentioned at all, and Mrs. Kackley was bequeathed one dollar. Soon after the suit was filed, Mrs. Kackley and her husband came in and gave a deed of trust of $6,500, on the ten acres, to secure the purchase price.

On November 21, 1925, Mr. Mytton prepared the power of attorney by which Marmaduke B. Morton, a neighbor of Mrs. Fleming and an officer in the Bartlett Trust Company of St. Joseph, and Edward Russell were appointed by Mrs. Fleming to manage and control all of her property. The Kackley affair made Mrs. Fleming consider it advisable to have a younger person, more experienced in business, actively in charge of her property. Mr. Mytton and Percy Russell both advised Mrs. Fleming to make this arrangement, although they testified that Mrs. Fleming made the decision herself and that it was at her suggestion that Edward Russell was included in it. Edward Russell was in Kansas City at the time and knew nothing about it until after it was made. The evidence was that he was Mrs. Fleming's favorite nephew. He frequently came to St. Joseph to see her and was very kind to her and solicitous about her welfare. He attended to such matters for her as putting in coal and looking after screens. She considered him almost as a son.

Mrs. Fleming and her husband had always transacted banking business with the Farmers & Traders Bank of St. Joseph. After executing the power of attorney she went with Percy Russell and got the contents of her deposit box there and took them to the Bartlett Trust Company, and her deposit was transferred there. Mr. Morton was actively in charge of paying her bills and taxes, and looking after her property. It does not appear that Edward Russell actually did much in the way of managing and controlling her property under the power of attorney. He was a traveling salesman and was on the road a considerable part of the time.

In February, 1926, Mrs. Fleming again became ill at her residence. Charles Blackiston and his wife were there at the time and the Kackleys were called in. This illness was more severe than the one in October. Later in the month, when she recovered, she went to her sister in Lawrence, Kansas, and early in March went to Mrs. Steward's home, in Phoenix, Arizona. The evidence was that during the time she was in Phoenix she was much improved in health; that her only illness there was a slight attack of indigestion which lasted only one day; and that she went out with the Stewards on drives, to dinner parties, and theatres, and helped them entertain guests in their home.

After she had been there a little more than a month, the evidence of the Stewards, which was the only evidence about the matter, was that Mrs. Fleming said: "She wanted to give Ed Russell that home at her death, and asked me (Mr. Steward) if there was any way she could give Ed her home when she no longer needed it." Mr. Steward had his attorney look up the Missouri law for the purpose of advising her. Upon the advice of this attorney, Mr. Steward told her: "That she could make a deed and put it in escrow in a bank with instructions to the bank to deliver the deed to Russell upon her death." She requested him to prepare such a deed. He had it prepared and gave it to her. According to Steward's testimony, Mrs. Fleming kept the deed a day or two and then told Mr. Steward: "She wanted to sign it and leave it at the bank to be delivered to Edward Russell upon her death." Mr. Steward had a notary go to the house and take her acknowledgment to the deed and he also wrote a letter, to the Citizens State Bank of Phoenix, which Mrs. Fleming signed. Mr. Steward was the cashier of this bank. The letter was as follows:

"Phoenix, Arizona, April 23, 1926.

"Citizens State Bank,

"Phoenix, Arizona.

"Gentlemen:—

"I hand you herewith a Deed to Lot 6, Block 7, Kemper's Addition to the City of St. Joseph, Mo., and also known as 1922 Clay St.

"You will please hold this deed until my death, at which time deliver the same to Edward F. Russell, as it is my desire that he own this property when I no longer need it.

"Yours very truly,

"REBECCA S. FLEMING.

"Margaret Schoonover,

"Notary Public. L.L. S."

Mr. Steward said that when Mrs. Fleming gave him the deed she said: "You keep this deed at the bank until my death, and then see that it is delivered to Edward Russell. I want him to have the property mentioned in the deed at my death." The assistant cashier of the bank testified that "Mrs. Fleming said she had intended for several years past to deed the property described in the deed to Mr. Edward Russell, and that she was glad she had it fixed up." The deed was a warranty deed dated April 19, 1926, and acknowledged April 26, 1926. The consideration was stated "one dollar and services to be rendered." This deed remained in the Citizens State Bank at Phoenix until December 14, 1926, at which time, upon receipt of the news of the death of Mrs. Fleming, the assistant cashier mailed it to Edward Russell at Kansas City. There was no evidence that Edward Russell ever knew that the deed had been executed until he received it through the mail.

Edward Russell was appointed executor by the will of Mrs. Flem-ing. He went to St. Joseph on the 16th of December, 1926, and qualified. He was again in St. Joseph on the 29th of December. As soon as he arrived there he went to the Recorder's office and filed the deed from Mrs. Fleming for record. He then went to the office of Mr. Mytton, who was attorney for him as executor. By that time the Blackistons had begun to threaten a will contest, and when Mr. Mytton learned that Edward Russell had a deed to Mrs. Flem-ing's residence and had filed it for record, he insisted that it be with-drawn, because he was of the opinion it would have a bad effect in a will contest. Edward Russell, therefore, went back at once to the court house and withdrew the deed from the Recorder's office. In the inventory of the estate, filed in probate court, soon there-after, the residence was appraised with the other estate land. The will contest was tried, and resulted, on July 2, 1927, in a verdict against the will. The Russells at first intended to appeal from this judgment, but decided, in October, 1927, not to perfect the appeal, and their attorneys were instructed to allow their motion for a new trial to be overruled. Edward Russell, on the 17th of October, 1927, again filed the deed and it was recorded. Shortly thereafter this suit was commenced.

Appellants, Mary Upson and Charles, Percy and Ebenezer Blackis-ton, testified to the mental condition of Mrs. Fleming. Mrs. Upson's testimony was that Mrs. Fleming was considerably changed after her two illnesses; that she was no longer congenial and sociable and did not like to have children around her, as she had before; that she was forgetful and repeated the same things often; and that during her sickness in February, 1926, there was no sense to her conversation and "there was no connection in the things she said, she just jabbered along." In connection with her testimony ap-pellants offered a postcard written by Mrs. Fleming from Lawrence, Kansas, in November, 1925, to Mary Upson, in the latter part of which she said "hope all keeps well with you and Mary and she has her place at Townsend and Wyet Store," showing that Mrs. Fleming had forgotten, before she completed the message, to whom she was writing. A postcard written to Mrs. Kackley from Phoenix, Arizona, in April, 1926, was also introduced, in which Mrs. Fleming repeated several times that she did not know when she would start east; that all were nice to her there; and that she hoped that all kept well. The three Blackiston boys' testimony was principally that she, at times, failed to recognize them and was forgetful about various matters and transactions. None of them expressed an opinion as to whether or not Mrs. Fleming was of sound mind.

A doctor who attended Mrs. Fleming, at the request of Mrs. Kack-

ley, during her two illnesses, and who saw her also on some other occasions, testified that she was of unsound mind. He said:

"I never saw Mrs. Fleming when I thought she was mentally all right. Her mind was that of a child. She would do unreasonable things. Her condition in that respect was pretty much the same all the time. She would have ideas she would want to take trips in an open car when the weather was bad and I was called out to Kackley's to see other folks and Mrs. Fleming would not know me. That was before the last sickness. In the fall of the year she wanted to start to Florida in an open car when the weather was bad. She wanted to go right then."

Appellants also called as witnesses the president and cashier of the Farmers & Traders Bank. They had transacted business with Mrs. Fleming for at least fifteen years. While they both said that she was failing in health and that they considered her more forgetful and more easily influenced than before, they testified they considered her competent to take care of her business. The president testified that he thought she got from Mrs. Kackley all that the ten acres, she sold her, was worth, taking into consideration the paving that would have to be done.

Respondents' evidence was that Mrs. Fleming was not only of sound mind but that she was exceptionally strong willed, bright, capable and determined, and was accustomed to having her own way. Her neighbors and advisers, Mr. Mytton and Mr. Morton, and Mr. Maxwell and Mr. Srite, with whom she had business transactions, testified orally at the trial on this issue. Her sister Mrs. Russell and her nephew Percy Russell testified by deposition, as did also Mr. and Mrs. Steward and two other witnesses, who lived in Phoenix, Arizona, and who had known Mrs. Fleming for many years and observed her on several of her visits there, including the last one. Another witness was an osteopathic physician who treated her while she was there. The members of the Russell family all testified that Mrs. Fleming had, for many years, expressed her intention to give her home to Edward Russell because he was the only member of the family who had no home of his own and because he was her favorite nephew.

Appellants' contentions are: (1) That there was no delivery of the deed; (2) that Mrs. Fleming was mentally incompetent to make a deed; (3) that the deed was the result of undue influence; (4) that the court admitted improper opinions of witnesses, and (5) want of consideration and failure of consideration.

Appellants' contention that there was not a valid delivery of the deed is based upon the final clause of the letter of instructions to the bank. The letter said: "You will please hold this deed until my

death, at which time deliver the same to Edward F. Russell, *as it is my desire that he own this property when I no longer need it.*" They also point out that she asked Steward: "If there was any way she could give Ed her home *when she no longer needed it.*" Appellants say that this shows that Mrs. Fleming did not desire to divest herself of the title at the time the deed was delivered to the bank, but intended to hold the title until she no longer needed it; that this was a reservation of the right to take the deed back, in case she needed the property for any purpose, as to sell it in order to pay her living expenses, if necessary; and that therefore there was no delivery of the deed and it passed no title to Edward Russell.

Delivery is essential to the validity of a deed. [Crider v. Meatte, 320 Mo. 474, 7 S. W. (2d) 691; Stump v. Marshall, 266 S. W. 476; Schooler v. Schooler, 258 Mo. 83, 167 S. W. 444; Donaldson v. Donaldson, 249 Mo. 228, 155 S. W. 791; Terry v. Glover, 235 Mo. 544, 139 S. W. 337; Chambers v. Chambers, 227 Mo. 262, 127 S. W. 86; Seibel v. Higham, 216 Mo. 121, 115 S. W. 987.] There is not a complete delivery unless the grantor parts with all dominion and control over the instrument with the intention that it take effect and pass title as a present transfer. [Van Huff v. Wagner, 315 Mo. 917, 287 S. W. 1038; Dallas v. McNutt, 297 Mo. 535, 249 S. W. 35; Ray v. Walker, 240 S. W. 187; Coles v. Belford, 232 S. W. 728; Whiteley v. Babcock, 202 S. W. 1091.] "Such intention may be manifested by acts, or by words, or by both words and acts." [Dallas v. McNutt, 297 Mo. 535, 249 S. W. 35; Schooler v. Schooler, 258 Mo. 83, 167 S. W. 444; Chambers v. Chambers, 227 Mo. 262, 127 S. W. 86; White v. Pollock, 117 Mo. 467, 22 S. W. 1077; Sneathen v. Sneathen, 104 Mo. 201, 16 S. W. 497.] The delivery of a deed by the grantor to a third person, with unconditional instructions that it be held by him and delivered to the grantee upon the grantor's death, is a valid delivery, if there is no reservation by the grantor of any dominion or control over the deed, and conveys to the grantee a present interest in the land. [Mendenhall v. Pearce, 323 Mo. 964, 20 S. W. (2d) 670; Tillman v. City of Carthage, 297 Mo. 74, 247 S. W. 992; Meredith v. Meredith, 287 Mo. 250, 229 S. W. 179; Peterman v. Crowley, 226 S. W. 944; Crites v. Crites, 225 S. W. 990; Schooler v. Schooler, 258 Mo. 83, 167 S. W. 444; Cook v. Newby, 213 Mo. 471, 112 S. W. 272; White v. Pollock, 117 Mo. 467, 22 S. W. 1077; Williams v. Latham, 113 Mo. 165, 20 S. W. 99; 8 R. C. L. 995, Sec. 60; 18 C. J. 208, Sec. 114; 52 A. L. R. 1222, note.] Under these authorities the right of future enjoyment of the grantee is subject to the use of the grantor during his life. Nor can a grantor, who has so deposited a deed with a third person, to be delivered to the grantee after the grantor's death and has reserved no dominion or control over the

deed, by subsequently changing his intention and withdrawing or destroying the deed, affect the delivery which was completed. [52 L. C. 1247, note, and cases therein cited.]

The deed from Mrs. Fleming to Edward Russell was an unconditional warranty deed. Her instructions to the bank were unconditional that it was to be held until her death and then delivered to Edward Russell. The words *"as it is my desire that he own this property when I no longer need it"* might be either the expression of her intention to reserve the right to use the residence during her life or the expression of the reason why she was making a deed to Edward Russell. These words do not instruct the bank to do anything. They do not say that the bank is to hold the deed only until she decided she needed to make some other disposition of the property, and we do not think they are susceptible of that construction. All the other facts and the circumstances show that it was her intention to make an unconditional delivery of the deed. She had for some time expressed the intention of giving her home to Edward Russell. She did not do so by her will, giving by it only money bequests, and dividing such property as remained after the payment of legacies. She asked advice as to how *"she could give Ed her home,"* and got the advice after the investigation, by an attorney, of the Missouri law who gave instructions that "she could execute a deed and deliver same to someone to be delivered to Edward F. Russell upon her death," and it was "explained to her that she could make a deed and put it in escrow in a bank, with instructions to the bank to deliver the deed to Russell upon her death." After it was done she expressed her satisfaction that "she had fixed it up" so as to carry out her long determined intention *"to deed the property"* to Edward Russell. We, therefore, hold that the court was justified in finding that it was the intention of Mrs. Fleming to make a delivery of the deed to the bank which would divest her of title and of control over the deed, and that she delivered it without right of recall.

As to the questions of mental incapacity and undue influence, the trial court, sitting as a chancellor in equity, found that Mrs. Fleming was of sound mind and sufficient mental capacity and that the deed was her own free act without undue influence or compulsion of anyone. Much of this evidence was, as we have pointed out, orally given. While this court, on appeal, tries an equity case *de novo*, on matters involving credibility of testimony given orally before the chancellor, we will usually defer to and follow the judgment of the chancellor on disputed questions of fact. [Vining v. Ramage, 3 S. W. (2d) 712; Webb v. Cotton, 308 Mo. 272, 271 S. W. 768; Woodruff v. Cole, 307 Mo. 19, 269 S. W. 599; Scott v. Barton, 285 Mo. 427, 226 S. W. 958; Walsh v. Walsh, 285 Mo. 181, 226 S. W. 236; Bryant v. Stahl, 217 S. W.

31; Henderson v. Ressor, 265 Mo. 718, 178 S. W. 175.] There was substantial evidence on both sides of the question of mental capacity, but the testimony of Mrs. Fleming's bankers, attorney and others with whom she had transacted business for years and who were apparently disinterested, no doubt weighed heavily with the chancellor. We will accept his findings.

Upon the question of undue influence, appellants point out that Mrs. Fleming had appointed Edward Russell in the power of attorney with Mr. Morton to control and manage her property. They say that if plaintiffs show a state of facts which establishes a fiduciary relation or some other confidential relation, between a principal beneficiary and a grantor, the law indulges the presumption that undue influence has been used and the burden is upon the grantee to show that his deed was not the result of undue influence. This court has so held. [Saettle v. Perle, 281 S. W. 431; Huett v. Chitwood, 252 S. W. 426; Cook v. Higgins, 290 Mo. 402, 235 S. W. 807; Cornet v. Cornet, 248 Mo. 184, 154 S. W. 121; Kincer v. Kincer, 246 Mo. 419, 151 S. W. 424; Mowry v. Norman, 204 Mo. 173, 103 S. W. 15; Dingman v. Romine, 141 Mo. 466, 42 S. W. 1087.] While the evidence here was that Mr. Morton was actively in charge of the business and that Edward Russell did very little under the power of attorney, yet, conceding that there was such a fiduciary or confidential relation, as to give rise to the presumption of undue influence, we think that the chancellor was justified in holding that this presumption was overcome. The evidence was that the deed was made, in Arizona, after due consideration and upon advice obtained at Mrs. Fleming's request; that it carried out an intention long expressed by Mrs. Fleming; that no one solicited Mrs. Fleming to make it; and that Edward Russell knew nothing about it. This evidence was uncontradicted and unimpeached. If worthy of belief, it is sufficient to overcome the presumption. We, therefore, see no reason for making a different finding upon the question of undue influence, and accept that made by the chancellor. Appellants dwell on Edward Russell's action, in withdrawing and concealing the deed during the will contest, but no estoppel was pleaded or shown.

Appellants' complaint as to inadmissible testimony would be sufficient, were this a law case, to require reversal and remanding for a new trial. This court has held that it is error to ask a witness to express his opinion concerning a person's mental capacity to make a will or a deed. [Fields v. Luck, 327 Mo. 113.] In an equity case, however, this court considers such evidence in the record as it deems admissible, excludes from consideration evidence improperly admitted, and reaches its judgment on the competent evidence offered. [Snow v. Funck,

41 S. W. (2d) 2; Rinkel v. Lubke, 246 Mo. 377, 152 S. W. 81; Rice v. Shipley, 159 Mo. 399, 60 S. W. 740.] There was sufficient admissible evidence here to sustain the findings of the trial court, and we will therefore not reverse the case because some incompetent questions were asked. Furthermore, it appears that the trial court had this rule in mind, since it admitted the depositions containing the improper questions subject to appellants' objections.

Appellants' contention that there was a want of consideration or failure of consideration of the deed is without merit. There was no contention in this case that this was a transaction in which Edward Russell was purchasing the land from Mrs. Fleming or was giving any consideration for it whatever. The evidence, in fact, was he did not even know it was made. It is clear that the deed was a gift and that love and affection was the real consideration. [Studybaker v. Cofield, 159 Mo. 596, 61 S. W. 246; Goodman v. Griffith, 238 Mo. 706, 142 S. W. 259.] The recital in the deed that the consideration was "one dollar and services to be rendered" would not, when the deed was in fact a gift, require anything to be done by Russell, and the deed could not be avoided except for mistake, fraud, duress, undue influence or other cause. [Chambers v. Chambers, 227 Mo. l. c. 287; Wells v. Kuhn, 221 S. W. 19; Melvin v. Hoffman, 235 S. W. 107; Palmer v. Palmer, 238 S. W. 423.]

The decree of the trial court is therefore affirmed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.