AUGUSTA A. HANNIBAL, Appellant, v. HANNIBAL BROS. ICE COMPANY, a Corporation, GEORGE J. HANNIBAL, FRIEDA HANNIBAL, CLEM HANNIBAL and ARTHUR HANNIBAL.—93 S. W. (2d) 1010.

Division One, April 23, 1936.

*Earl M. Pirkey* for appellant.

*L. Marshall Eckert* for respondents; *Adolph Thym* of counsel.

BRADLEY, C.—This cause is in equity to require defendants to return to plaintiff 26½ shares of the capital stock of defendant Hannibal Bros. Ice Company of North St. Louis, or its value, and to pay her the profits, thereon accruing and interest, since the death of her husband, October 25, 1924. Plaintiff acquired this stock under the will of her husband, Louis J. Hannibal. The petition was filed May 16, 1929, but the cause was not tried until March 1, 1933. The trial court found for defendants and dismissed plaintiff's petition *with* prejudice as to all defendants, except George H. Hannibal, and as to him the petition was dismissed *without* prejudice. Not successful on motion for new trial, plaintiff appealed.

The petition is on the theory that the stock was fraudulently obtained from plaintiff and sets out the facts, from plaintiff's view, relative to the alleged fraud. The answer is a general denial. At oral argument a question of our jurisdiction arose and we shall first dispose of that question. We do not have jurisdiction of this appeal, unless it affirmatively appear that the amount in dispute is in excess of $7500. [Sec. 3, Amendment 1884; Sec. 1914, R. S. 1929, Mo. Stat. Ann., sec. 1914, p. 2587.] Plaintiff surrendered the stock involved, according to her evidence, to defendant, George H. Hannibal, about December 9, 1924, but, according to the evidence of George H., the stock was turned over to him February 11, 1925. If plaintiff prevails, she is entitled, on her theory, to recover the stock or its value (which she claims was as much or more than the book value) at the time she assigned it, plus whatever profits have since been derived therefrom, and also interest. It is not necessary here to refer at length to the evidence as to the value of this stock at the time it was assigned by plaintiff. The book value at that time was $11,104.25. Such being the situation, jurisdiction of the appeal, we think, is here.

At the time of the death of plaintiff's husband, defendant, ice company, had a capital stock of $10,000, divided into 100 shares of the par value of $100 each. For some time prior to October 25, 1924, date of death of Louis Hannibal, husband of plaintiff, Louis held 26-2/3 shares, Herman Hannibal held 26-2/3 shares and defendant, George H. held 46-2/3 shares. Shortly after the death of Louis, George sold his stock to Herman and at the same time turned over to Herman the 26-2/3 shares received from plaintiff. Herman, died March 14, 1931, after this cause was filed, and thereafter an amended petition was filed making parties defendant, Frieda, Clem and Arthur Hannibal, who are, respectively, the widow and sons of Herman. Louis died testate leaving, by his will, his entire estate to plaintiff, except a nominal amount to each of his children. Plaintiff was named executrix in the will and administered the estate.

The assignment of the Louis Hannibal stock by plaintiff was to the ice company, but when George sold out to Herman in late February or early in March, 1925, this stock was turned over to Herman as though

it were the property of George. Louis, George and Herman were brothers. The ice company was an old institution, founded by their father and his brothers in 1849. Concerning the assignment of the stock, plaintiff testified that George came to her home and wanted to talk to her about "the stock papers of my husband," and that he said "the business is failing and I am losing lots of money and I want you to sign these papers;" that he went on to say "that if I did not, he would have to declare the business a bankrupt" and that such "would be a disgrace for you and the children;" that he said "sign it over and if you don't sign it, you will have to sign it anyway, because I will put it into bankruptcy and of course you will have to help pay the debts." Plaintiff said that she thought George "was telling the truth;" that she "did not know any better." She said that George told her that her husband was overdrawn with the ice company, but did not tell her how much; that no one, except George, talked to her about the matter. George denied saying to plaintiff that the ice company was in a failing condition, and denied saying anything to plaintiff about bankruptcy and that she would have to pay, etc. He testified that "we had an accountant to go over the books, and to go over them thoroughly, and after he had finished with that, why, he just told me of the condition Louis was in, how much he had overdrawn. So I asked him whether he would not kindly go out there to Mrs. Hannibal and show them this statement, which he did." On objection the court struck out "which he did." As to what George said to plaintiff, he testified: "Well, I told her I come out here with the stock, and I would like for her to sign it over to me, and she—and I told her at the time she knew well enough that Louis had overdrawn, and she said yes she did. And so after she had signed the stock and turned it over to me, why, she said, 'and what are you going to do about the balance of the overdrawn?' I said I did not know."

It appears that, at the time of his death, plaintiff's husband was overdrawn with the ice company $17,177.47 over and above what was due him on salary. The book value of his stock, 26-2/3 shares, was on that date, $11,104.26. Louis, therefore, owed the ice company $6,073.21 more than the book value of his stock. After the Louis Hannibal stock was turned over to George, the account of Louis was credited with an amount equal to the book value, leaving a balance, as above appears, in favor of the ice company of $6,073.21. The ice company did not file any claim in the probate court against the estate of Louis for this balance. Plaintiff, on December 28, 1925, filed her final settlement in the probate court, which was approved and this settlement showed "a balance left in the estate, after everything is paid, of $6.366.76."

The profit and loss of the ice company from 1924, to 1932, both inclusive, appear in the record, and over these years there was a loss each year, except in 1924. The losses over these years exceed the

profits in the sum of $7,444.15. The assets of the ice company on October 31, 1924, a few days after the death of plaintiff's husband, as given by defendant, Arthur Hannibal, from the books of the ice company, is shown in the record as follows:

ASSETS

| | | |
|---|---|---|
| (1) | Accounts receivable | $ 316.29 |
| (2) | Office account | 650.00 |
| (3) | Real estate | 7,300.00 |
| (4) | Furniture and fixtures | 417.75 |
| (5) | Stable account | 2,000.00 |
| (6) | Live stock | 885.00 |
| (7) | Rolling stock and harness | 3,600.00 |
| (8) | Implements | 105.15 |
| (9) | Louis Hannibal overdrawal | 17,177.47 |
| (10) | Herman Hannibal overdrawal | 11,105.15 |
| (11) | George Hannibal overdrawal | 2,721.81 |
| (12) | Cash balance on hand | 2,100.38 |

TOTAL .................$48,141.85

LIABILITIES

(1) Bills payable ...........................$ 6,500.00

Under the above statement, let us take October 24, 1934, the day prior to the death of plaintiff's husband, and assume the same financial condition as on October 31st, as shown in the above statement, and assume the collection, on October 24th, of the overdrawals and accounts and the conversion of the remaining assets into cash, and the payment of the debt of $6500, and assume distribution among the three stockholders on that date. On such assumption, there would have been for distribution, $41,641.85. Louis owned 26-2/3 shares of the 100, or 4/15 of the total. On this basis, he would have been entitled to receive 4/15 of the $41,641.85, or $11,104.49, but in order to receive this sum, he would have had to pay his overdrawal of $17,177.47. In other words, Louis would have paid out $6,072.98 more than he received, which amount is twenty-three cents less than the amount Louis' estate owed the ice company after his account was credited with the book value of the stock, as shown above. The item of twenty-three cents may be an error in our arithmetic.

But there is another statement of assets and liabilities of October 31, 1924, appearing in the record, and no explanation of the difference. The one above was given from the books of the ice company by defendant, Arthur Hannibal, as stated, who was secretary-treasurer of the ice company since his father, Herman, acquired the interest of George Hannibal in February or March, 1925. Arthur, from the beginning of his connection with the ice company, had charge of the books. The other statement, appearing presently, was given from the same books of the ice company by defendants' witness, Oscar H.

Greiman, who was in the employ of the ice company as bookkeeper from about 1911 until 1928 or 1929. Greiman gave a more detailed statement than did Arthur Hannibal. The situation on October 31, 1924, from the Greiman statement is:

ASSETS

| | | |
|---|---|---:|
| (1) | Accounts receivable | $ 1,767.97 |
| (2) | Suspense accounts | 3,339.11 |
| (3) | Office account | 650.00 |
| (4) | Real estate | 7,300.00 |
| (5) | Feed inventory | 1,773.30 |
| (6) | Furniture and fixtures | 417.75 |
| (7) | Stable account | 2,000.00 |
| (8) | Live stock | 885.00 |
| (9) | Rolling stock | 3,360.00 |
| (10) | Implement account | 108.00 |
| (11) | Coal total inventory | 16,954.80 |
| (12) | Wages account | 10,527.50 |
| (13) | Louis J. Hannibal overdrawal | 17,177.47 |
| (14) | Herman Hannibal overdrawal | 11,105.15 |
| (15) | George Hannibal overdrawal | 2,721.81 |
| (16) | Interest account | 309.04 |
| (17) | Ice account | 12,913.12 |
| (18) | Cash balance on hand | 2,100.38 |

TOTAL .................$85,407.83

LIABILITIES

| | | |
|---|---|---:|
| (1) | Capitol stock | $10,000.00 |
| (2) | Bills payable | 6,500.00 |
| (3) | Surplus account | 31,869.96 |
| (4) | Cash, ice | 5,026.12 |
| (5) | Ice wagons out | 21,483.96 |
| (6) | Cash on coal | 8,925.19 |
| (7) | Paid on accounts receivable | 1,451.68 |
| (8) | Return on suspense account | 150.94 |

TOTAL .................$85,407.83

It will be noted that the Greiman statement varies $1,451.68 from the Arthur Hannibal statement in the accounts receivable item, but that is explained in item 7, paid on accounts receivable, in the liabilities statement of Greiman. Also, item 7 under assets in the Arthur Hannibal statement, rolling stock *and harness*, is $240 more than item 9 in the Greiman statement, but the Greiman statement does not include harness, so that, perhaps, accounts for this variation. Other variations in the statements are: Items 2, 5, 11, 12, 16 and 17, assets in the Greiman statement, do not appear at all in the Arthur Hannibal statement of assets. The total of these items is $45,816.87.

Items 1, 3, 4, 5, 6, 7 and 8 in the Greiman liabilities statement do not appear in the Arthur Hannibal liabilities statement. The total of the items last mentioned is $78,907.83. In other words, the Greiman statement includes $45,816.87 more assets than does the Arthur Hannibal statement and $78,907.83 more liabilities, and among the items of liabilities included in the Greiman statement is $31,869.96 surplus, which was considered in determining the book value of the Louis Hannibal stock. No effort was made to explain the variations in the Arthur Hannibal and Greiman statements. Both were derived from the same books. No effort was made to explain items 2, 5, 11, 12, 16 and 17 in the Greiman assets statement, nor was any effort made to explain items 4, 5, 6 and 8 in the Greiman liabilities statement. In fact, but little effort was made to explain any item. The items were read from the books. The books were not introduced; neither was any formal statement of assets and liabilities introduced. We have had to glean, here and there, from the record, the items we have assembled in the statements which we call the Arthur Hannibal and Greiman statements. Also we might say we have not had much aid from counsel.

Quite a portion of the record is taken up on the subject of the value of the real estate, but we do not deem it necessary to go into that. When George Hannibal sold to Herman in February or March, 1925, he had his 46-2/3 original shares and the 26-2/3 shares received from plaintiff. Although assigned to the ice company, the Louis Hannibal stock in the deal between George and Herman was, as stated, treated as belonging to George. For the 73-1/3 shares George received $5000 and "six or seven hundred dollars" in liberty bonds, and as we understand the record, was then or prior, given credit for his overdrawal. It will be noted that George's overdrawal with the ice company was only $2,721.81, or $14,455.66 less than was the overdrawal of plaintiff's husband. If the price received by George for the 73-1/3 shares was the reasonable value, then plaintiff was indeed fortunate that her stock was turned over as it was and credit given her husband's account for its book value. And especially was she fortunate, assuming the George Hannibal sale a fair value sale, that the ice company did not file any claim in the probate court against the estate of her husband. It is true that the ice company did not file any claim in the probate court and it was too late to file such claim, when the present cause was filed, yet such situation is bound to have weight with a court of conscience. [10 R. C. L., p. 392, sec. 141; 21 C. J., p. 174, sec. 152.] The trial chancellor made no finding as to facts, but merely dismissed plaintiff's petition, as stated, and we have, therefore, no information on what theory the finding below was based. It could have been on the theory that plaintiff turned over the stock in order to settle her husband's overdrawal, which was then a live obligation and could have been filed against estate. ■ While, on appeal in an equity

case, we try it *de novo*, yet we defer, if reasonable to do so, to the finding below. [Blackiston et al. v. Russell et al., 328 Mo. 1164, 44 S. W. (2d) 22,.1. c. 26, and cases there cited.] The chancellor below in the present cause had the books of the ice company before him. He saw and heard the witnesses and dismissed plaintiff's petition.

 We find no grounds that will justify overturning the judgment below. It follows, therefore, that the judgment should be affirmed, and it is so ordered. *Ferguson* and *Hyde*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.